[No. S004507. June 9, 2003.]

In re MICHAEL ANTHONY COX on Habeas Corpus.

976

## COUNSEL

Harvey R. Zall, Fern M. Laethem and Lynne S. Coffin, State Public Defenders, under appointments by the Supreme Court, Barry P. Helft, Assistant State Public Defender, Joel Kirshenbaum, Michael Pescetta, Kathleen M. Scheidel, Musawwir Spiegel, Valerie Hriciga and Mary McComb, Deputy State Public Defenders; Anderson and Zimmer and Richard Zimmer for Petitioner Michael Anthony Cox.

John K. Van de Kamp, Daniel E. Lungren and Bill Lockyer, Attorneys General, Steve White, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Arnold O. Overoye and Robert R. Anderson, Assistant Attorneys General, William G. Prahl, Jane N. Kirkland, Edmund D. McMurray, Harry Joseph Colombo, John G. Mclean and R. Todd Marshall, Deputy Attorneys General, for Respondent State of California.

## OPINION

**MORENO, J.**—On November 26, 1985, petitioner was sentenced to death for the 1984 first degree murders of teenagers Denise Galston, her sister Debbie Galston, and Lynda Burrill, with the special circumstance of multiple murder. (Pen. Code, §§ 187, 190.2, subd. (a)(3).) Petitioner's automatic appeal has been considered and our opinion affirming the judgment of guilt is being filed simultaneously with this opinion. (*People v. Cox* (2003) 30 Cal.4th 916 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

### I. EVIDENCE ADMITTED AT PETITIONER'S TRIAL

The facts adduced at petitioner's trial are set forth in detail in our opinion in the automatic appeal, *People v. Cox, supra,* 30 Cal.4th 916. In brief, the evidence showed that the three teenage victims—Debbie Galston (Debbie),

Denise Galston (Denise) and Lynda Burrill (Lynda)—lived in Placerville. Debbie, Denise, Joanna N. (Joanna) and Darlene S. (Darlene) lived in Nona Chapman's foster home. Joanna testified that she saw petitioner stab Denise to death on June 12, 1984. Lynda was alone with petitioner when last seen alive on June 29, 1984. Debbie disappeared on August 8, 1984, and petitioner was seen in the same vicinity at the time of her disappearance. Petitioner had made disparaging remarks toward all three victims and had threatened Debbie. The unclothed bodies of all three victims were found in the El Dorado National Forest. Darlene, petitioner's girlfriend at the time the murders occurred, testified that petitioner told her he had killed the three victims.

## II. The Habeas Corpus Petition

### A. *Statement of the Case*

On February 29, 1988, while the automatic appeal was pending, petitioner filed the instant petition for writ of habeas corpus alleging that prosecution witnesses Joe and Linda Crespin and Darlene had testified falsely at trial; that the prosecutor withheld from the defense a statement from a potential witness, Kathy Erbe, that impeached the testimony of Joe and Linda Crespin and Darlene; and that trial counsel provided ineffective assistance of counsel. On August 18, 1988, we issued an order to show cause. On June 22, 1989, we issued a reference order directing the taking of evidence on three questions:

"1. What, if any, information was provided to the prosecution by Kathy Erbe regarding statements made by Joe and Linda Crespin relevant to this case? If any such information was provided, was it furnished to the defense? Which, if any, statements relevant to the case attributed by Kathy Erbe to Joe and Linda Crespin were in fact made by the Crespins?

"2. Did Darlene [S.] give false testimony at trial that was substantially material or probative on the issue of guilt or punishment? If so, in what respects was her testimony false?

"3. Was trial counsel Patrick Forester's pretrial investigation of the credibility of Darlene [S.] conducted in a manner to be expected of reasonably competent attorneys acting as diligent advocates? If not, in what respects was it inadequate? If his investigation was inadequate, what additional information would an adequate investigation have disclosed?"

On April 6, 1990, petitioner filed a supplemental petition for writ of habeas corpus alleging that Joanna, the sole eyewitness to the murder of

Denise, had testified falsely at trial. On October 24, 1990, we issued another order to show cause. On March 27, 1991, we added a fourth question to be addressed during the reference hearing:

"4. Did Joanna [N.] give false testimony at trial that was substantially material or probative on the issue of guilt or punishment? If so, in what respects was her testimony false?"

The reference hearing commenced in February 1994. On August 5, 1994, during the hearing, petitioner filed a second supplemental petition for writ of habeas corpus alleging that Linda Crespin gave false testimony at trial regarding a statement that she attributed to petitioner. On September 7, 1994, we expanded the reference order to include the following question:

"5. Did Linda Crespin give false testimony at trial that was substantially material or probative on the issue of guilt or punishment, when she testified that petitioner said he was seeing a girl named Linda, and that 'girls like that should be eliminated'?"

B. *Events Prior to the Reference Hearing*

On January 16, 1992, Joanna was granted immunity by the El Dorado County District Attorney's Office for any false testimony she may have given at petitioner's preliminary hearing and capital trial, and as to any false statements contained in a 1990 posttrial declaration. Thereafter, she recanted the part of her trial testimony in which she claimed to have seen petitioner kill Denise. Instead, she claimed she had not been an eyewitness to the murder and had "made up" the whole story.

Darlene also testified at the reference hearing under a grant of immunity given by the El Dorado County District Attorney's Office. Like Joanna, Darlene recanted portions of her trial testimony and also stated that petitioner never confessed his involvement in the murders to her.

C. *Summary of the Referee's Findings*

As noted, the reference hearing commenced in February 1994. It was conducted by retired San Joaquin County Superior Court Judge Bill Dozier. The hearing concluded on January 19, 1995. After extensive briefing, the referee filed his 1,129-page report on July 7, 1999.

As explained more fully below, the referee found that (1) Kathy Erbe did not provide, prior to trial, any relevant information to the prosecution; (2)

Darlene's trial testimony was true regarding many of petitioner's incriminating acts and statements, but Darlene fabricated petitioner's confession because of undue pressure from law enforcement; (3) trial counsel's performance was deficient because he failed to subpoena Darlene's education records and failed to prepare transcripts of Darlene's tape-recorded interviews with sheriff's deputies, but these omissions did not prejudice petitioner; (4) despite her recantation, Joanna's trial testimony that she had witnessed petitioner murder Denise was true, but she lied about how she had returned to Placerville following the murder; and (5) Linda Crespin did not testify falsely at trial when she said petitioner told her that girls like Lynda should be "eliminated." The referee also found that the false trial testimony by Joanna and Darlene was not substantially material on the issue of petitioner's guilt or punishment. For the reasons stated below, we discharge the order to show cause.

## III. Evidence Admitted at the 1994 Reference Hearing

### A. *Joanna*

#### 1. *The 1992 Recantation*

##### a. *Background*

As recounted in detail in our opinion in the automatic appeal (*People v. Cox, supra,* 30 Cal.4th at pp. 929-930), Joanna testified at trial in 1985 that she accompanied petitioner and Denise to a wooded area near Placerville. She heard Denise screaming and saw her running in the nude, her hands behind her back, with petitioner in pursuit. Petitioner caught up with Denise, pushed her down, and stabbed her. Joanna then ran to a road, flagged down a passing car, and got a ride back to Placerville with a person named Joe.

Joanna recanted her trial testimony on January 16, 1992, but the circumstances surrounding her recantation were suspect. In 1990, Joanna separated from her husband, Allen Dwyer. The two became embroiled in a bitter custody battle over their daughter. In March and April of 1990, Dwyer, Anita Hooser (Dwyer's mother), and Laura Lawrence (Dwyer's friend) executed signed declarations, prepared by the State Public Defender's Office, that stated Joanna told them she had lied at trial. Dwyer further claimed that Joanna told him she was passed out in a park at the time she claimed to have witnessed the murder.

On April 27, 1990, Joanna executed a responding declaration denying she ever told Dwyer, Hooser, or Lawrence that she had lied at trial; she admitted

that she originally had lied to police shortly after the murder because she was afraid they would think she was involved in the murder if she said she was a witness; she added that her trial testimony was true. Joanna stated that Dwyer's allegations stemmed from the custody dispute and the fact she had filed a child abuse claim against Dwyer.

### b. *Defense Investigator Tactics*

In September 1990, Marilyn Mobert, an investigator with the State Public Defender's Office, armed with the Dwyer declaration, arrived at Joanna's house unannounced and, in front of Joanna's daughter, accused Joanna of having lied at trial and threatened her with a perjury charge. She told Joanna that a witness would place Joanna in a park in the late night hours of June 12, 1984, which would show that Joanna's trial testimony about witnessing the murder was a lie. (No such witness ever came forward.) Mobert then told Joanna that she would not go to prison and lose her children if she told the truth. Mobert suggested that there was a "solution"; Joanna could hire a lawyer who could arrange a grant of immunity. Joanna could then safely go to court, recant her trial testimony, receive no punishment and keep her children.

Joanna testified she was so upset by Mobert that she burst into tears. Immediately thereafter, Joanna phoned El Dorado County Sheriff's Sergeant Bill Wilson in a panic. Joanna told him that she did not want this case to interfere with her custody dispute. Sergeant Wilson thereafter told his wife that Joanna might recant her trial testimony. His fears were realized. On January 16, 1992, Joanna, in the presence of her attorney, formally recanted her trial testimony after she had been granted immunity.

### c. *Joanna's Recantation*

Dr. Frank Dougherty, a psychologist, conducted a portion of the interview of Joanna that took place on January 16, 1992. Joanna told Dr. Dougherty she did not see petitioner kill Denise. She claimed she had lied about witnessing Denise's murder because she "felt . . . pressure whether it be [from her] own self" or from the fact that she felt she had to say "something significant." She asserted she had not seen petitioner on June 12, 1984, the night Denise was murdered.

Joanna claimed to remember an incident in which a cement block was thrown through the windshield of a police car (see *People v. Cox, supra,* 30 Cal.4th at pp. 928-929), but after that point she was not sure what she "did for the next . . . hour or so," but recalled that she "ended up" sleeping at

Bruce Nesthus's house. She said she was not frightened when she was with Nesthus and did not hide behind him when cars drove by. She said she made up the little details of the murder, like throwing up once she got out of petitioner's car at the murder scene, "as I went along."

Joanna also stated that in 1987, after the trial was concluded, she had a conversation with Sergeant Wilson in which she told him that she had lied at trial about getting a ride back from the scene of the murder with a person named Joe. She added that she may have told Sergeant Wilson that she lied about seeing Denise get stabbed, but she had heard Denise scream. Sergeant Wilson, she said, told her that these details were not significant.

Dr. Dougherty pointed out that Joanna told him, back in November 1984, that on the night of Denise's murder, she had seen Denise at the Stancil's Toyota dealership and near the tunnel underpass. Joanna replied that she made that up. Dr. Dougherty asked why she made that up, given that she had not yet told him she was a witness to the murder. Joanna replied: "I don't know. I don't really have a good reason for it."

When asked why she told Fay Harnage and her husband, El Dorado County Sheriff's Detective Erol Harnage, that she knew something about the case when she now claimed she knew nothing, Joanna replied: "I . . . I really don't know the answer to that, except that I was a very confused teenager at the time and . . . ah . . . I . . . I don't have a good explanation for it."

### d. The Three Trips to the Murder Scene

As more fully explained in our opinion in the automatic appeal (*People v. Cox, supra,* 30 Cal.4th at pp. 931-932), on two occasions prior to trial, Joanna led Dr. Dougherty and El Dorado Sheriff's deputies, Detective Harnage and Sergeant Wilson to the scene of Denise's murder. The first time, on November 2, 1984, Joanna directed them to Ferrari Mill Road as far as the intersection known as "Four Corners," where she became nonresponsive. On November 6, 1984, they returned to Four Corners and Joanna, who had started to cry, recognized a tree stump painted with yellow paint and told them to go straight ahead but, after they had gone about a half-mile, said they were on the wrong road. They returned to Four Corners and Joanna pointed to the road on their left, which was the road leading to where Denise's remains had been found.

During trial, Joanna returned to Four Corners with Sergeant Wilson. She told him to drive straight ahead but after they had gone about 75 yards she

told him to return to the intersection and directed him to the right. After they had gone about 150 yards, she again had him return to the intersection and take the road to the left, which was the road leading to where Denise's remains had been found. When they reached the area where Denise's body had been found, she asked Sergeant Wilson to stop the car. She exclaimed, "This is the spot," and began to cry.

During the January 16, 1992 interview in which Joanna recanted her testimony, Dr. Dougherty asked Joanna how she was able to give directions to the murder location. Joanna said: "We drove up there, and the only reason why I did know was that I, somehow I . . . I knew that it was off of Ferrari Mill Road." She continued: "And so I was able to show you that was where it was. And I don't know if I read that in the paper. There's a possibility that maybe the bodies had been found there . . . or . . . ahm . . . somebody maybe had said that to me. But I think it was through the paper." Dr. Dougherty asked Joanna how she knew how to get to Ferrari Mill Road, adding that he did not know how to get to that location. She replied: "I didn't really know." Joanna continued: "I didn't really know, but . . . since I had found Debbie's clothes approximately, I don't know, a few miles around that area, I assumed that it was in the same area. And I was looking for the road." When asked how she knew to get to the Sly Park area, Joanna replied: "Ah, I had found Debbie's clothes in that . . . in a similar area. I'm not sure if it's the same road but called Camp Creek which is up Sly Park, same area."

Later, Joanna was asked if it was just a coincidence that she began crying when they reached the scene of the murder. Joanna replied: "I have no idea how I did that, I have no idea." In fact, Joanna claimed she learned the location of the body was on Ferrari Mill Road, "Not long before they . . . they had taken me out there. I, in fact, maybe it had been the day before."

### 2. *Joanna's 1994 Reference Hearing Testimony*

#### a. *Direct Examination by Petitioner*

On direct examination at the reference hearing, Joanna made several claims that were inconsistent with the 1985 trial evidence, her 1985 trial testimony, and her 1992 recantation.

Joanna testified that she did not recall seeing Placerville Police Officer Phillip Dannaker upon her return to Placerville on October 30, 1984, and said she spoke to Fay Harnage "about a week or a week and a half" after her return and not, as she had testified at trial, on the day of her return.

Joanna testified that she was concerned when the El Dorado County Sheriff's deputies wanted her to take them to where she claimed Denise was

murdered because they would find out she was lying. But she had read in the paper that Ferrari Mill Road was where the bodies were found and she knew "probably where it was, knowing it was past the second dam and knowing where I'd found Debbie's clothes, that it was probably nearby."

Joanna claimed she had specific knowledge of Ferrari Mill Road because of two newspaper articles in the Mountain Democrat, dated August 13 and 22, 1984, that mentioned where the girls' skeletons were found. Specifically, the August 13 article stated that female skeletons were found "within three quarters of a mile of each other off Ferrari Mill Road, which runs off Mormon Emigrant Trail (Iron Mountain Road) near the second dam and Jenkinson Lake." The August 22 article stated that dental charts "determined that skeletal remains found off Ferrari Mill Road Aug[ust] 4" were those of Lynda and Denise. Joanna claimed she was familiar with that area because "[t]hat was the area near where [Debbie's] clothes were found." When the referee pointed out to Joanna that the area where Debbie's clothes were found was several (actually 12) miles away from where Denise's body was located, Joanna hesitantly replied: "Well, it was still—it was several miles, but it was near comparative to it being out in the country out there." She claimed not to have the "faintest idea" where the bodies were found on Ferrari Mill Road itself.

Joanna asserted that, contrary to her trial testimony, petitioner never requested anal intercourse from her. She stated that, contrary to her trial testimony, Joe never gave her a ride off the mountain, but that Joe was a real person by the name of Joe Shamblin. Joanna stated that when Sergeant Wilson, prior to petitioner's jury trial in 1984, told her "they thought they had found Joe," she lied to Sergeant Wilson and told him that that was the wrong Joe because the Joe who had given her a ride had moved to Reno, Nevada.

Joanna testified that on June 22, 1985, during trial, Sergeant Wilson, without warning, told her they needed to go to the murder scene. Once they got to Four Corners, Wilson told Joanna to take him to the murder location. Joanna knew the first two roads she directed Wilson to drive on were incorrect simply because Wilson was "very agitated." As she knew there was only one road left, Joanna said she lied when she said, "I knew this was the road all along." She knew where to stop on this road because Wilson "was silent the whole time on this road, but he just was completely silent," so she knew she must be near the right place. She said she was lying when she pointed out to Wilson different areas where she did things and where she saw things the night of the murder.

Joanna testified that she lied in 1990 when she signed the declaration stating that her trial testimony was true. She claimed, however, that her 1992 recantation was truthful.

b. *Cross-examination by the People*

Joanna testified that, for a period of a week or two weeks after she found Debbie's clothes, she checked the Mountain Democrat newspaper for articles on petitioner's case and learned about Ferrari Mill Road from two articles, dated August 13 and 22, 1984. She agreed neither article gave directions to Ferrari Mill Road. Joanna volunteered that the only reason she was able to find Ferrari Mill Road was because she saw a road sign. She said she had never noticed the road before November 1984. Once on Ferrari Mill Road, she "guessed" which direction to go when the road forked before they reached Four Corners.

Joanna claimed her clothes were not soiled or dirty at any time when she was with Bruce Nesthus. She claimed she never told Fay Harnage "I was there." Nor was she hysterical when she told her story to Fay Harnage; she was just "talking" about the case to her. She agreed, however, that Fay Harnage was a complete stranger and she met her by accident. Joanna also said she lied when she said she recognized the tree stump with the yellow markings.

Joanna was reminded that in her 1992 recantation statement, she had acknowledged that after telling Darlene that she found Debbie's clothes, Darlene replied that she and petitioner had just been to Camp Creek, even though Joanna had not mentioned that Camp Creek was where she found the clothes. Joanna was then confronted with her reference hearing testimony that she did tell Darlene she found the clothes at Camp Creek, and Darlene "gasp[ed]" because she and petitioner had just been there. Joanna said she could not recall which version was truthful.

Joanna said she did not recall telling Officer Dannaker on August 12, 1984 that she had been drinking with Denise, that she had walked with Denise to the Locust Street underpass, had watched Denise walk through the underpass towards the foster home and, at that same time, had seen petitioner drop off Darlene at the foster home. (See *People v. Cox, supra*, 30 Cal.4th at p. 929, fn. 2.) Joanna agreed, however, that if she made that statement to Officer Dannaker, she would have been telling him the truth.

B. *Darlene*

1. *Darlene's Posttrial Statements*

a. *1988 Statement*

In February 1988, Kevin S., Darlene's brother, signed a declaration in which he claimed that in the summer of 1984, Darlene told him she

witnessed the murder of one of the girls and her job was to "fold clothes and clean up" after the murder. In 1988, Sallie Sanders executed a similar declaration, wherein she claimed that in 1984 Darlene told her she witnessed a murder.

In response, Darlene executed her own declaration on April 15, 1988, in which she said that in 1984 she was having a very hard time with her feelings about petitioner because she believed he killed the three girls. That summer, she found a skirt in petitioner's trunk that looked like it belonged to Denise or Debbie. There were stains on it that could have been blood. Petitioner denied the clothes belonged to Denise or Debbie and denied that the stains were blood. Darlene said that the only clothing she ever handled or folded was the clothing she found in the trunk, and she was not present when any of the girls were killed, nor did she ever tell anyone that she witnessed any such event.

### b. *Defense Investigator Tactics*

On October 23, 1990, Tom Elliot and Marilyn Mobert, investigators for the State Public Defender, made a "cold call" on Darlene at her residence in Rancho Cordova. At the reference hearing, Mobert testified that her assignment was to acquire any information that would cast doubt on the trial testimony of Joanna and Darlene. Mobert stated that this was the first time she met Darlene. She added that she had reviewed Darlene's April 15, 1988, declaration prior to the interview. During the interview, Darlene told the investigators, in essence, that the 1984 murders were part of a satanic cult ritual. One week later, on October 30, 1990, Mobert returned to Darlene's residence. She brought a tape recorder and a six-page declaration prepared by a defense attorney that memorialized the October 23 interview. Darlene signed the declaration prior to the tape-recorded interview.

In the declaration, Darlene claimed that in August 1984, she told the trial prosecutor, Ron Tepper, that she was with petitioner at a campsite on North South Road the night Debbie disappeared. Darlene claimed that petitioner drugged her, tied her arms and legs and put her in the backseat of his car. Joanna and Debbie were in the front seat and they drove into the woods. Joanna pulled Debbie from the car and orally copulated her. Debbie was secured to an altar and nine men had sex with her. Afterwards, petitioner asked Joanna for a knife. He cut open Debbie's stomach, pulled out a fetus, and the members of the group ate the fetus. Petitioner cut Debbie's throat and all members of the group drank her blood. Darlene said she passed out and woke the next day. Three days later she "lost control" of herself and eventually was sent to a psychiatric unit. She added that all three girls were

pregnant when killed, and all three were killed as sacrifices in satanic rituals. Joanna was the "bait" to get the girls into the car. Darlene said she married petitioner in September 1984 so she would not be the next sacrifice. Darlene claimed petitioner threatened to kill her the day before he was arrested, but she ran away from him. Darlene claimed she lied at trial, with Ron Tepper's permission, in order to protect her family.

Mobert testified that she met with Darlene again on November 9, 1990, to "do some clean-up type questions." Her next visit with Darlene, she said, was in Reno, Nevada, on April 1, 1993. Mobert stated that she was accompanied by a defense attorney and their visit was unannounced. During this interview, Darlene told Mobert that the satanic story was "more than likely a dream" and now she wanted to tell the "truth," that petitioner was not responsible for the murders. Mobert acknowledged that Darlene had a low IQ and was susceptible to suggestion.

On December 21, 1993, Mobert, accompanied by a defense attorney, interviewed Darlene regarding Darlene's claim that petitioner did not commit the murders. Mobert denied discussing the subject of immunity with Darlene during this interview. Darlene, however, did mention that she was afraid she would lose custody of her children if she testified at the reference hearing that petitioner did not commit the murders.

Mobert was recalled to the witness stand the following day. She testified that she now remembered that the subject of immunity for Darlene arose at the December 21, 1993 interview. Mobert added that the subject of immunity was also raised by Darlene during an April 1992 interview that took place in Placerville. Mobert added that on a date after December 21, 1993, she was taking Darlene and Mark Wilson (Darlene's husband at the time) back to Reno after a trial preparation session, and Mark Wilson informed Mobert that Darlene would not testify unless she received a grant of immunity. Prior to testifying at the reference hearing, Darlene received immunity from the El Dorado District Attorney's Office for any false testimony she might have given at petitioner's preliminary hearing and jury trial. At the reference hearing, Darlene recanted significant portions of her trial testimony.

### 2. *Darlene's Pretrial Statements*

On November 9, 1984, and on December 4, 1984, Darlene spoke to El Dorado County Sheriff's deputies Sergeant Wilson and Detective Harnage. The interviews were tape-recorded. Transcripts of three tape recordings from the November 9, 1984, interview and the transcript from the one tape

recording of the December 4, 1984, interview were admitted into evidence at the reference hearing. These tapes and transcripts had not been introduced into evidence at the 1985 jury trial.

### a. *November 9, 1984—First Tape*

Present during this interview were Darlene, El Dorado Sheriff's deputies Sergeant Wilson and Detective Harnage, and Darlene's mother and stepfather, Shirley and Gerald W. Darlene said that the night Denise disappeared, petitioner dropped her off at the foster home about 11:00 p.m. Joanna came home the next day and said she had seen Denise walking through the tunnel the previous night. She said petitioner never talked to her about Denise, except for one comment shortly after Denise's disappearance. Darlene told petitioner that Denise was gone, and he replied that Denise knew better than to spend time with Joanna.

Sergeant Wilson pressed Darlene for more information and promised to protect her. Darlene said she was "petrified" of petitioner and that he had married her so she would not talk to "the police." The sheriff's deputies told Darlene that petitioner was the last person to see Lynda and Denise alive. Darlene stated that petitioner knew Lynda and her parents.

### b. *November 9, 1984—Second Tape*

Joanna was present during this second taped interview. Sergeant Wilson informed Darlene that Joanna had given them a "whole lot" of information and Joanna was going to tell her what she saw. Joanna asked Darlene why she said to her, the night of August 12, that "it was gonna all be over, and [petitioner] would be arrested." Darlene replied that she did not know why she said that.

Sergeant Wilson asked Joanna to tell Darlene what happened after petitioner took Darlene home the night Denise disappeared. Joanna said she was not able to tell Darlene because she did not want to upset her. Wilson then told Darlene that Joanna saw what petitioner had done to Denise. Darlene said she did not know anything. When her mother pressed her for information, Darlene replied, "I don't know nothin', Mom. I swear to God—I didn't know nothin'—[petitioner] wouldn't tell me. I tried to get it out of him. He would—he would just jump on my case . . . if I talk[ed] about Debbie and Denise." Darlene said that on August 12, she led Placerville police officers to where she thought the bodies were because she and petitioner camped in that area and she "had the feeling he did it." (See *People v. Cox, supra,* 30 Cal.4th at pp. 940-941.) Darlene agreed she had said, "[petitioner] did it."

Sergeant Wilson told Darlene that petitioner could not be arrested until she told them something. Her mother asked Darlene how many more 13- and 14-year-old girls would have to be buried before petitioner was "put away." Detective Harnage and her mother told Darlene that petitioner was "sick" and Darlene, by cooperating, could "help" him.

Sergeant Wilson praised Joanna for coming forward and told Darlene that Joanna looked "so good" because they had helped her. He wanted Darlene to be protected in the same way they protected Joanna. He explained that Darlene, like Joanna, was entitled to witness funds, and that she could use the money to buy herself clothes or get her hair done. Sergeant Wilson reiterated that it was not safe for Darlene because people in town were "after" petitioner. Joanna stated that she and others talked about beating up petitioner on Halloween. Darlene said petitioner had more guns again and, if he were bothered, the police would have to bring out the SWAT team.

Detective Harnage reiterated that Darlene was the "last piece to the jigsaw puzzle." Sergeant Wilson explained that, like Joanna, maybe Darlene "knew something but didn't want to remember it." When asked why she told people at the foster home that Debbie was not coming home, Darlene said, "I had a feeling there was something goin' on," because she had "never seen [petitioner] act so funny before." Sergeant Wilson continued to insist that petitioner must have told her "something." She said he did not.

c. *November 9, 1984—Third Tape*

With Joanna no longer present, Sergeant Wilson informed Darlene that "[y]our mom told us what you told her," but said they wanted to hear the information from Darlene herself. Darlene agreed that petitioner knew Lynda, and that he kept guns and knives in his car. Darlene added that a week or two before any of the girls were missing, petitioner said he would "eliminate . . . three girls in the foster home and eliminate three more." Darlene said he never brought up that topic again. Darlene stated that petitioner kept one gun under a quilt in the back of his car, another gun under his seat, a knife above the sun visor on the passenger side, and handcuffs underneath the quilt. Petitioner told her "Debbie was next or some way he put it," and that was "[a]fter the two ones have missed, have gone." She told the deputies that she was afraid of petitioner and had nothing more to add.

d. *December 4, 1984 Taped Interview*

On December 4, 1984, El Dorado County Sheriff's deputies Sergeant Wilson and Detective Harnage again interviewed Darlene. Darlene's stepfather was present. Sergeant Wilson asked Darlene if she recalled "everything

that I told you at the house today about what could happen, and, things like that" and offered her immunity from prosecution, adding: "So, don't be scared about going to jail, because I don't think that you have done anything that you can go to jail for, but we wanna—we have to make sure." Sergeant Wilson then asked, "Why don't you tell everything that you know about Denise?"

Darlene informed them that petitioner, at the Exxon station, had indeed admitted that he killed Denise and that he intended to kill Joanna but she ran away. Darlene said this conversation took place "[b]efore he got a hold of Debbie" but, when prompted, agreed it occurred a day after Debbie disappeared. Darlene said he picked up Denise and Joanna to go to a party but instead took them to the woods. He said he grabbed Denise, stabbed her and strangled her, took off her clothes, and laid her body by a log.

Darlene stated that petitioner picked up Lynda, told her he was going to take her to a party, "and pretty soon he takes her to North South Road, where Denise is, and he says he did the same thing as to Denise. Took all her clothes off, and everything and threw them away, and they were both in the same places as Debbie and Denise." Petitioner said he left Lynda's body close to Denise. Darlene added that petitioner first said he took off Denise and Lynda's clothes, handcuffed them, tied their feet with his hiking rope, had sex with them while they were alive and then stabbed them. She said petitioner learned to tie "weird knots" in the Cub Scouts.

Petitioner told Darlene he was paid $150 to kill Denise and Debbie, and was paid $120 to kill Lynda. Darlene said petitioner told her "he seen [Debbie] at the park and he was waiting for her to get done with the party and he seen her walking, so he pulled up, asked her [if she wanted] a ride up to the house and he took her up to the . . . same place." Petitioner added that he picked up Debbie after he dropped off Darlene, and he put Debbie's body "somewhere further away" from Lynda and Denise. He told her he threw Debbie's clothes off the bridge. She said petitioner married her so she could not testify against him and he would "get [her]" if she testified against him. She said she was too scared to have told the deputies this earlier.

Sergeant Wilson asked Darlene if it worried her when he said she could be arrested if she withheld information. She replied yes. Sergeant Wilson told Darlene the threat of arrest "[m]ade you start thinking about it." He added that she did not do anything wrong, but if she had done something wrong, "that would be different," and they would have to talk about immunity.

Darlene said petitioner told her he brandished a knife to get Denise and Joanna in his car. She then backtracked and said Denise made Joanna get in

the car. She said that petitioner had "contracts" on many girls, including Joanna.

Shirley W. arrived. She confirmed that petitioner had ended his relationship with Darlene on November 7, 1984. Darlene stated that petitioner finally told her about the murders because "he already had a contract on me." When asked why he wanted these girls dead, Darlene said that petitioner told her "if you have to kill these people . . . the devil will not take their soul." She said that petitioner believed in devil worship.

Darlene, contrary to her earlier statement, now said petitioner put Lynda's body close to Debbie's and Darlene's bodies, "[b]y a log." She said petitioner never mentioned Ferrari Mill Road. She said she found Debbie's unicorn key chain underneath the front seat of petitioner's car while they were cleaning the car after Debbie's murder. Petitioner said, "now you know," and that is when he decided to tell her everything. Darlene said petitioner told her to put the key chain back among Debbie's belongings at the foster home and "be quiet about it." The sheriff's deputies later found the key chain among Debbie's belongings. It had no keys on it.

### 3. Darlene's 1994 Reference Hearing Testimony

#### a. Direct Examination by Petitioner

As noted, Darlene testified under a grant of immunity for any perjury she may have committed at petitioner's preliminary hearing and jury trial. She recanted most of her trial testimony. She said that petitioner never told her "three would be eliminated" from the foster home "and three more." On the night of Denise's disappearance, petitioner was cleaning his gun and sharpening his knife and said he had to "take care of business," but that phrase referred to a poker game, as he sometimes gambled for weapons instead of money. "Taking care of business," she emphasized, did not mean petitioner was going to kill anyone.

As to the night of Debbie's murder, Darlene now said that petitioner did not pull a knife from his car's visor and say he had to take care of business. Darlene said she did find Debbie's unicorn key chain in petitioner's car, but that incident occurred before Debbie was murdered, not a day or two after Debbie's disappearance. She said she made up the key chain story because it linked Debbie to petitioner's car. She said petitioner did not confess his crimes to her at the Exxon station, and never told her at any time that he murdered the three girls.

After petitioner moved out of the residence he shared with Darlene in early November 1984, Darlene had one contact with sheriff's deputies that

took place at the Placerville Police Department. She said she kept repeating that she did not know anything, but everyone refused to accept her answers. It made her "very upset" that they were "accusing [petitioner] of something he didn't do." Joanna told her that she, Joanna, saw petitioner kill Denise. Darlene said everyone told her she was next and offered her protection. The sheriff's deputies informed her that Joanna was in "witness protection." Darlene said she believed she would have to tell them about petitioner to get the same help.

Darlene stated that after the November 1984 interview, the sheriff's deputies would "not leave [her] alone." Her parents told her she would wind up in prison. The sheriff's deputies accused her of being part of a conspiracy. Finally, in December 1984, she gave a statement implicating petitioner because she wanted them "to get out of my face." All of the details she provided about the murders from the December 4 interview she had learned from the detectives, Joanna, or the newspaper. The sheriff's deputies stopped harassing her after she told them of petitioner's confession.

### b. *Cross-examination by the People*

Darlene said she loved petitioner when she testified at the jury trial, and denied he had left her for another woman in November of 1984. She said petitioner was innocent and she was pressured into lying. She denied camping with petitioner on North South Road. But when confronted with her trial statement that she camped on North South Road with petitioner five, six, or seven times, she admitted that was true. She admitted seeing a knife, guns and handcuffs in petitioner's car.

Darlene claimed she did not know what time petitioner took her home the night Denise was murdered. That night, after petitioner dropped her off at the foster home, she smoked a cigarette on the hill and saw Joanna wave down petitioner and talk to him. Darlene said that Joanna never got in his car. She said that she did not see Denise at that time.

Darlene said that petitioner never said he knew Lynda's parents. When confronted with her contrary jury trial testimony, Darlene said she was referring not to petitioner, but to her stepfather, because he knew Lynda's parents. She said her stepfather asked her to lie about this incident.

Darlene agreed she was at Benham Park with petitioner the night Debbie disappeared. She saw Debbie drinking in the park. Darlene left the car and went to use the bathroom. Petitioner did not stay in the car, but was sitting on a picnic bench when she returned. At the jury trial she said he did stay in

the car. She explained this inconsistency: "Yes. He was sitting in the car because we were getting everything—we went and was sitting on the picnic bench." At the jury trial, she made up the story about petitioner pulling a knife from his visor and saying "this is a good night for business." When asked "where did that detail come from," she replied, "From the top of my head." When asked "what was the purpose of it," she said, "I have no idea."

Darlene stated that, on August 12, 1984, Placerville police officers not only took her to the area where she and petitioner camped (Camp Creek) to find Debbie's body, but "[t]hey [also] took me on Ferrari Mill Road showing me [possibly] where Debbie and Denise were at." When asked why she testified at the jury trial that she had never been on Ferrari Mill Road, Darlene said she was "afraid" to admit this fact at trial.

Darlene confirmed her preliminary hearing testimony that petitioner had scratches on his face and chest in June or July 1984, which was around the time Lynda was murdered. The scratches looked like fingernail scratches, and the scratch on petitioner's chest was long and deep.[1] She added: "But it doesn't explain why he got the scratches."

Darlene claimed she lied at trial because she was threatened by her mother and stepfather, was threatened by the El Dorado County Sheriff's deputies when the tape recorder was turned off, was interrogated for 10 to 12 hours in a little room, and was not allowed to go to the bathroom. She also claimed she was escorted to the bathroom by a female sheriff's deputy because they "didn't want [her] running off." Sergeant Wilson later testified that Darlene was never denied a bathroom break and the interview took three to four hours to complete.

Darlene explained that her remark to sheriff's deputies, on the second November 9 tape, that after Debbie's disappearance she had "never seen [petitioner] act so funny before," meant only that petitioner was acting "funny" in a humorous way.

Darlene agreed that she said to Sergeant Wilson, on the second November 9 tape, that petitioner told her three girls would be eliminated from the foster home and then three more, but she claimed she never actually heard petitioner make that remark, and offered five versions: First, she said she heard it from Sergeant Wilson. Then she said she heard it from Joanna. Then she

---

[1]At the preliminary hearing, Darlene testified that she observed long fingernail scratches on petitioner's face and chest at the very end of June or early July 1984. Linda Crespin also noticed a scratch on petitioner, severe enough to require medicine, the day after Lynda disappeared.

said Joanna had heard it from Sergeant Wilson. Then she said her mother specifically told her to lie and say that she, Darlene, heard petitioner say it. She also stated that the "number one reason" she told that lie at trial was because Sergeant Wilson told her to say it.

Darlene testified that her stepfather told her to say that petitioner had sharpened his knife the night Denise was murdered, and her stepfather also encouraged her to make up "story lines after story lines, just like writing a book." She claimed she lied at trial because of threats from her parents and the sheriff's deputies. When the tape recorder was on, she said, they would tell her she was not a suspect, but when they turned it off, they would say the opposite. She said she was booked and fingerprinted sometime in November 1984. Sergeant Wilson later acknowledged that Darlene was photographed and fingerprinted in accordance with "department policy" even though she was not a suspect. He added that she was not booked. Darlene admitted she was never put in any locked facility.

Darlene denied ever telling Barbara Rugg that she "was afraid petitioner would find out she talked to the police," and that "it's all going to be over with, [petitioner's] going to be arrested." She denied telling Placerville Police Officer Dannaker that she had visions of the girls being murdered. She denied telling her mother that she did not kill Debbie, petitioner killed Debbie. She claimed petitioner kept handcuffs in his car because someone once broke into his car, and if somebody broke into his car again petitioner was going to handcuff them to the door of his car.

Darlene claimed that the statement in her 1988 declaration, that her parents never forced her to say anything, was a lie because she was "still in fear of [her] parents," even though they lived in a different state. She thought her mother would put her in prison by making up a story that she was involved in the killings, but then she stated she was on good terms with her mother throughout this period. Darlene stated that the death of her stepfather in August 1992 prompted her to come forward because while he was alive, she feared what he would do if she recanted. His death, she said, took away that fear.

Darlene acknowledged that, on October 23, 1990, she spoke to State Public Defender investigators Thomas Elliot and Marilyn Mobert about petitioner's involvement in the murders. She said she gave them false information because she "was too afraid to talk." When asked why, if she was too afraid to talk, she said anything, Darlene replied, "I have no reason." Darlene stated that petitioner was never involved in the occult or satanism. She added that in 1990, she thought her satanic version of events actually

had happened. However, a few days after she signed the October 30, 1990 declaration, Darlene realized she had made a mistake because "This [version] was never true. This was a dream. This was a nightmare."

### C. *Kathy Erbe*

At the 1994 reference hearing, Kathy Erbe testified that prior to trial, she had several meetings with the Crespins. She said Linda Crespin told her that (1) petitioner did not commit the murders and was being framed; (2) it was a cult murder; and (3) it was a Charles Manson-type murder and petitioner was the leader, but he had not done the actual killings. Kathy Erbe also stated that Joe Crespin had told her husband, Steven Erbe, that the girls had been offered as sacrifices on an altar and were cut from their throats to their vaginal areas.

Erbe also said that Linda Crespin believed a person named Kip Miller was involved in the murders, and that she (Erbe) passed the information along to Sonia Miller, Kip's mother. Erbe stated that she gave all of this information to trial prosecutor Ron Tepper and district attorney investigator Ernie Birtwell. She claimed that Tepper told her he was not interested.

### D. *Linda Crespin*

In 1988, Linda Crespin executed a declaration that refuted Kathy Erbe's statements. She stated that she told Erbe that she was distressed and that the killings were like a serial killing or something like a Manson killing, but she never stated that petitioner was the leader of, or that he had any involvement in, a cult. She said that petitioner told her he was being framed, not that she believed he was being framed. Crespin stated that Erbe brought up the subject of Kip Miller and that she (Crespin) did not know Kip Miller nor any facts about his involvement. She added that she never told Erbe any details about the case. Crespin reaffirmed that her trial testimony was true, and the only item she wondered about was whether petitioner actually said the word "eliminate."

At the 1994 reference hearing, Crespin affirmed the substance of her 1988 declaration. She added that she now believed that petitioner did not use the word "eliminate" in 1984, but instead said something to the effect that girls like Lynda should be "done away [with]" or "pass[ed] off" or "avoided." She told the referee that she did not know the exact word.

## IV. DISCUSSION

### A. *Standard of Review*

"'A habeas corpus petitioner bears the burden of establishing that the judgment under which he or she is restrained is invalid. [Citation.] To do

so, he or she must prove, by a preponderance of the evidence, facts that establish a basis for relief on habeas corpus. [Citation.]' " (*In re Cudjo* (1999) 20 Cal.4th 673, 687 [85 Cal.Rptr.2d 436, 977 P.2d 66], quoting *In re Visciotti* (1996) 14 Cal.4th 325, 351 [58 Cal.Rptr.2d 801, 926 P.2d 987].)

██ " 'The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence.' " (*In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466].) "Deference to the referee is particularly appropriate on issues requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying. [Citations.] On the other hand, any conclusions of law or resolution of mixed questions of fact and law that the referee provides are subject to our independent review. [Citation.]" ██ ██ ██ (*In re Hamilton* (1999) 20 Cal.4th 273, 296-297 [84 Cal.Rptr.2d 403, 975 P.2d 600], fn. omitted.)[2]

### B. *The Referee's Findings: Joanna*

██ Petitioner contends Joanna's trial testimony that she witnessed the killing of Denise was false. For the reasons stated below, we adopt the referee's finding to the contrary.

It has long been settled that "the offer of a witness, after trial, to retract [her] sworn testimony is to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722 [114 Cal.Rptr. 429, 523 P.2d 229]; see also *In re Roberts* (2003) 29 Cal.4th 726, 743 [128 Cal.Rptr.2d 762, 60 P.3d 165].) This principle is especially true here, as Joanna affirmed her trial testimony in

---

[2]Throughout his report, the referee took judicial notice of portions of the trial transcript. The referee believed that it was impossible to judge the credibility of witnesses who testified 10 years after a jury trial without referring to the evidence introduced at that trial. Petitioner argues that it was improper to utilize the trial transcript in this manner. We disagree. The consideration of the former testimony of any witness at the reference hearing is permitted under Evidence Code sections 769, 770, 780, subdivisions (g), (h) and (i), 791, 1235, and 1236 (prior consistent and inconsistent statements). Moreover, both sides pointed out that the referee would have to consider the trial testimony to review the factual evidence presented, and for the purpose of making a materiality finding. As we stated in *In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468]: "In reaching his findings the referee necessarily compared and weighed this live testimony *together* with the written exhibits. We have no reason to doubt the witnesses' demeanor and manner of testifying played a role in the referee's resolution of many of the questions posed." (Italics added.) On the other hand, in those situations in which the referee took judicial notice of the trial testimony of a witness who did not testify at the reference hearing, we will independently review that witness's trial testimony. (Cf. *In re Marquez* (1992) 1 Cal.4th 584, 604 [3 Cal.Rptr.2d 727, 822 P.2d 435] [court is not bound by referee's recommendation concerning evidence not presented at habeas corpus hearing].)

1990; and after she was granted immunity, she made several assertions in her 1992 recantation that were materially inconsistent and contrary to assertions she made in her 1994 reference hearing testimony.

In addition, the referee listened to tapes and read transcripts of Joanna's prior statements and testimony. He visited the crime scenes. He also had the benefit of gauging Joanna's credibility, as well as the credibility of the other reference hearing witnesses whose testimony bore on the credibility of Joanna, based on his observation of their demeanor and manner of testifying. In support of his finding that Joanna witnessed the murder of Denise, the referee made the following findings, which we accept as true because they are based on the referee's credibility assessments and are supported by substantial evidence:

### 1. Defense Investigator Marilyn Mobert's Role

The referee found that State Public Defender investigator Marilyn Mobert scared Joanna into recanting her trial testimony by discussing perjury, prison, and loss of custody of her children. Her "technique," stated the referee, "consists not so much [of] the finding of evidence but as creating it by threatening witnesses, scaring witnesses, putting words in the mouths of witnesses, preparing false reports and testifying falsely in court." As the referee pointed out, Joanna never discussed recanting her testimony nor took any steps towards that end for six years after the trial. In 1990, she executed a declaration affirming her trial testimony. However, immediately after her September 1990 meeting with Mobert, Joanna phoned Sergeant Wilson in tears and in a panic and later, in January 1992, recanted. Because the referee's factual findings are supported by the evidence, we accept them as true.[3]

### 2. Statement to Fay Harnage

Fay Harnage testified at the reference hearing that, on October 30, 1984, the day after Joanna returned to Placerville, she picked up Joanna by the side of the roadway in front of her house to give her a ride. They had never met before. Joanna was upset and emotional. She said she knew something about the murders of the three girls, and was afraid that petitioner would kill her.

---

[3]Petitioner claims that the referee was biased against him based on the referee's finding that Mobert scared Joanna into recanting. Because we have determined that this finding is supported by substantial evidence, we reject petitioner's claim of bias. Petitioner also asks that we incorporate into the record the complete document entitled "Petitioner's Corrections to Referee's Intended Decision—Marilyn Mobert Appendix," in the mistaken belief that the court did not possess the complete document. As the record before us contains both the complete and incomplete versions of this document, petitioner's request is denied as moot.

Fay testified that Joanna was so distraught, she thought Joanna might jump out of her car. Joanna told Fay, "I was there," but it was "too terrible" to talk about. The referee found that Fay Harnage was credible. He rejected Joanna's 1994 testimony that she was not hysterical or excited when she spoke to Fay Harnage. We accept this finding as true.

### 3. *Joanna's Asserted Memory Loss*

Joanna stated, during her 1992 recantation, that she had no recollection of the events of June 12, 1984, from the time of the incident in which a cement block was thrown through the windshield of a patrol car in downtown Placerville until meeting Bruce Nesthus, and that the time frame of this memory loss was an "hour or so." But the cement block incident took place between 9:10 and 9:30 p.m. on June 12, and Joanna met Nesthus in Placerville at approximately 3:30 a.m. on June 13. The referee therefore rejected Joanna's claim that her memory loss was an "hour or so."

The referee also rejected the claim that Joanna had no recollection of the events of June 12 after the cement block incident because on August 12, 1984, Joanna admitted to Placerville Police Officer Dannaker that she was with Denise on June 12, saw her walk under the overpass towards the foster home, and that she saw petitioner drop off Darlene as Denise walked towards the foster home. We accept these findings as true.

### 4. *Joanna's Clothing at 3:30 a.m.*

At the 1994 reference hearing, Bruce Nesthus testified that Joanna's clothing was "neat" when he saw her at the Stancil's Toyota dealership in Placerville between 10:00 p.m. and midnight. However, Nesthus testified that when he saw Joanna later, at 3:30 a.m., her clothing was "soiled and dirty," "like you'd be on a tractor in a field and get dusty, but not caked on mud or anything like that." At the reference hearing, Joanna claimed her clothes were clean at this later time. The referee found that Nesthus was a "neutral and reliable witness" and accepted Nesthus's testimony as true. We accept the referee's finding.

### 5. *Finding Ferrari Mill Road*

#### a. *The Newspaper Articles*

On January 16, 1992, Joanna stated that she knew how to get to the murder scene because "somehow" she knew "it was off of Ferrari Mill Road." She was not sure if she read that in the paper or somebody told her.

But she claimed that she learned it was Ferrari Mill Road "maybe . . . the day before" the deputy sheriffs took her to the location. She claimed she did not know how to get to Ferrari Mill Road, but assumed it was in the "same area" in which she found the clothes.

At the 1994 reference hearing, Joanna's testimony changed dramatically. Joanna claimed to have specific knowledge of Ferrari Mill Road from two newspaper articles, dated August 13 and 22, 1984. While she claimed she had never noticed the road before November 1984, she said she was familiar with the area because it was "near where the clothes were found." She claimed not to have "the faintest idea" where the bodies were found on Ferrari Mill Road itself. Once at the "Y" (the fork in the road before Four Corners), she said that she correctly "guessed" which direction to go.

The referee found that Joanna lied in both 1992 and 1994. As the referee pointed out, Camp Creek, where Joanna found the clothes, was 12 miles from Ferrari Mill Road, so Joanna's "assumption" that she found Ferrari Mill Road because it was in the "same area" as Camp Creek was disingenuous.

Moreover, Joanna's two statements are suspect because of their material inconsistencies. In the 1992 recantation interview, Joanna claimed that she learned of Ferrari Mill Road from the paper (or somebody told her) perhaps "one day" before her November 1984 trip with the sheriff's deputies. At the 1994 reference hearing, however, she claimed she knew of Ferrari Mill Road from two newspapers articles she read on August 13 and 22, 1984—*more than two months* before the trip. Finally, Sergeant Wilson testified at the 1985 jury trial that Joanna told him she did not read any newspaper articles about the case. The referee found that Joanna did not read the newspaper articles until after her 1992 recantation. We accept this finding as true.

b. *The Ferrari Mill Road Sign*

Joanna stated at the 1994 reference hearing that but for the Ferrari Mill Road sign, she would have never found the road. But Joanna never mentioned the road sign during the January 16, 1992 interview, or on direct examination in 1994. She only added this piece of information on cross-examination in 1994. The referee rejected this testimony because it was contrary to the evidence.

Dr. Dougherty testified at the reference hearing that on the first night he, Joanna, and El Dorado County Sheriff's deputies, Sergeant Wilson and Detective Harnage drove to the murder scene, Joanna was in the backseat, on

the passenger side. He sat next to her, in the middle of the backseat. Joanna, he said, did all the directing. Dr. Dougherty said that Joanna "almost always looked out the right window because you couldn't see very well through [the] other—you had to be close to the window to see through it. So she was looking straight out to her right out the window as we passed different areas." He described Ferrari Mill Road as an unmarked dirt road, and when the vehicle reached that location, Joanna told them to turn right. Dr. Dougherty did not recall seeing a sign on Ferrari Mill Road. He said Ferrari Mill Road was "dark, maybe muddy, and we couldn't see out of the window very well." The referee found that Dr. Dougherty was a credible witness.

Sergeant Wilson provided the referee with additional details about the first trip to the murder location. He explained that it was snowing heavily that night. Once on Mormon Emigrant Trail, they passed several spur roads. As they approached Ferrari Mill Road, Joanna became excited and told them to "slow down." Ferrari Mill Road was a T-intersection; there was no road to the left. Joanna told them to turn right. But the street sign was on the opposite side of the road, to their left. Sergeant Wilson did not recall seeing the sign, as it was snowing heavily. Ferrari Mill Road, he said, was a dirt road with snow on the ground. At the "Y" fork on Ferrari Mill Road below Four Corners, Joanna said to go to the right but after they had gone 150 yards, she said this was the wrong road. They then proceeded up the left side of the "Y" fork. As they went up a hill with ruts in it, Joanna said she remembered that hill. Past the top of the hill, they came to Four Corners. Joanna told them to stop. The referee found that Sergeant Wilson was a credible witness.

Based on the evidence that it was snowing, the visibility was poor, and Joanna always looked to her right, the referee rejected Joanna's claim, made for the first time on cross-examination at the reference hearing, that she saw the Ferrari Mill Road sign that was located on the opposite side of the road. Instead, the referee determined that Joanna told the sheriff's deputies to turn on Ferrari Mill Road because she was there the night of the murder. We accept this finding as true.

### 6. *June 22, 1985 Trip*

Sergeant Wilson testified at the reference hearing that on the June 22, 1985 trip, Joanna "described, as we left the [Four Corners] intersection, that we would go over a small rise and drop down off this rise and it would level out, the road would level out as we went down off the rise." Wilson stated that that did happen. He added: "Before we got to the [third] landing, actually, we went into a small draw and she seemed like she was getting, for

lack of a better word, excited. She was scooting forward in the seat. [¶] She said, 'slow down real slow here,' when we were in this turn. . . . kind of an S effect, and as we came around the top part of the S, the road widened out into this landing. She got very excited and started telling me to stop." Sergeant Wilson stated that when he asked Joanna why she wanted to stop, she replied: " 'That's where [petitioner's] car was parked the night Denise was killed.' " This spot was, in fact, within 75 yards of the murder scene.

The referee found this testimony to be true and probative of the fact that Joanna witnessed Denise's murder. The referee rejected Joanna's reference hearing testimony that she knew where to stop the car on the June 22 trip because in observing Sergeant Wilson's demeanor, he went from being "silent" to "completely silent." We accept this finding as true.

### 7. *Joanna's Ride to Placerville with Joe*

At trial, Joanna testified that after she saw petitioner stab Denise, she ran towards the road and got a ride back to Placerville with Joe. In her 1992 recantation, Joanna claimed that in 1987, she told Sergeant Wilson that she lied about getting a ride back with Joe and instead, had ridden home with petitioner the night of Denise's murder. Sergeant Wilson, she said, informed her that this detail was not significant. In both her 1992 recantation and her 1994 reference hearing testimony, she maintained that Joe had not given her a ride back to Placerville that evening.

At the 1994 reference hearing, the defense called Joe Shamblin to testify. He stated that he knew Joanna, having met her at Happy Trails in 1983 or 1984. Shamblin testified that he never picked up Joanna hitchhiking in the middle of the night on Mormon Emigrant Trail. He also claimed he contacted law enforcement prior to the original jury trial because his parents had seen a newspaper article in which the police stated they were looking for a person named Joe that fit his description. He said he thought he spoke to an officer named Bill.

Sergeant Wilson acknowledged that Detective Harnage had interviewed Joe Shamblin prior to the original jury trial and, afterwards, that he (Sergeant Wilson) informed Joanna that they might have found the Joe who gave her a ride home the night Denise was murdered. But Joanna, he said, told him this was not the "right Joe." Joanna said that the person named Joe who gave her a ride had moved to Nevada. Sergeant Wilson stated that he "still felt there was [another] Joe" who gave Joanna a ride home. He testified that,

to his recollection, no report of the Joe Shamblin interview was prepared and the interview was never disclosed to the defense.[4]

The referee found that the person named Joe that Joanna described to the sheriff's deputies was, in fact, Joe Shamblin, and that Joanna lied in this portion of her trial testimony. The referee instead concluded that Joanna rode home with petitioner. The referee believed that Joanna's riding back to Placerville with petitioner explained a great deal about Joanna's behavior after Denise was murdered, including her reluctance to come forward. We accept this finding as true.

C. *The Referee's Findings: Darlene*

As noted earlier, "the offer of a witness, after trial, to retract [her] sworn testimony is to be viewed with suspicion." (*In re Weber, supra*, 11 Cal.3d at p. 722.) As the court said in *People v. McGaughran* (1961) 197 Cal.App.2d 6, 17 [17 Cal.Rptr. 121], "It has been repeatedly held that where a witness who has testified at a trial makes an affidavit that such testimony is false, little credence ordinarily can be placed in the affidavit . . . ." (See also *In re Roberts, supra*, 29 Cal.4th at p. 742.) These principles are especially apt here, as Darlene executed an affidavit in 1988 that affirmed her trial testimony; executed a 1990 declaration that asserted the murders were part of a satanic ritual but later recanted that statement; and then recanted her trial testimony after she was granted immunity.

The referee carefully listened to Darlene's November 9 and December 4, 1984 tape-recorded interviews and read transcripts of Darlene's prior statements and trial testimony. He viewed the exhibits and visited the crime scenes. He also had the benefit of gauging Darlene's credibility, as well as the credibility of the other witnesses whose testimony bore on the truthfulness of Darlene's statements. " 'The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence.' " (*In re Hitchings, supra*, 6 Cal.4th at p. 109.)

1. *Darlene's 1994 Reference Hearing Testimony*

At the 1994 reference hearing, Darlene recanted most, if not all, of her jury trial testimony that incriminated petitioner. The referee gave little credence to Darlene's recantation because he found that her love for petitioner had revived, "and by reason of her grant of immunity, she could say

---

[4]Detective Harnage, who was retired at the time, testified at the reference hearing on March 1, 1994. He was not questioned regarding an interview with Joe Shamblin. Detective Harnage was killed in an auto accident on April 8, 1994. The trial prosecutor, Ron Tepper, also met an untimely death prior to the reference hearing.

whatever she wanted to about her trial testimony with impunity." As such, the referee found she "lied almost at random" at the reference hearing.

For example, the referee rejected Darlene's explanation at the reference hearing that she recanted because her stepfather died (and thus she no longer feared retribution from him), given that she had not lived with him since 1984, they lived in separate states, she saw him very seldom, she did not like him, and she had had a close and loving relationship with her mother through 1993. As such, the referee believed that Darlene would not be affected by her stepfather's disapproval. Moreover, Darlene did not recant for more than a year after her stepfather's death; had her fear of him been the reason for remaining silent, the referee believed that Darlene would have recanted much sooner.

Instead, the referee believed that, like Joanna, Darlene recanted because of the conduct of State Public Defender investigator Marilyn Mobert. He found that Mobert initially lied to the court when she claimed the subject of immunity never arose during her interviews with Darlene. He found that Mobert initiated the subject of immunity and, through several visits and phone calls to Darlene from 1990 through 1993, manipulated Darlene into recanting by impressing upon her that a grant of immunity would ameliorate any concerns she may have had about losing custody of her children, and leading Darlene to believe immunity would protect her from any adverse consequences stemming from her false 1990 declaration. We accept these findings, which are supported by substantial evidence, as true.

### 2. *Darlene's 1985 Jury Trial Testimony*

The referee made several findings regarding Darlene's 1985 trial testimony: (1) the referee found that petitioner did not confess to Darlene at the Exxon station; instead, the "confession" was prompted by Sergeant Wilson's statement to Darlene, on December 4, 1984, that she would be arrested if she withheld information; (2) the referee also found that Darlene did not find Debbie's key chain in petitioner's vehicle that day; and (3) the referee found that Darlene did not see petitioner pick up Denise and Joanna the night Denise was murdered.

But the referee also found that much of Darlene's trial testimony incriminating petitioner was true. The referee found true those portions of Darlene's testimony in which her account of the events was first given prior to Sergeant Wilson's December 4, 1984 threat of arrest, or where her testimony was "100 percent corroborated" by physical evidence or witness testimony. As will be shown below, we accept the referee's findings as true because they are supported by substantial evidence.

### a. *False Statements by Darlene*

#### i. *The Confession*

The December 4, 1984, taped interview revealed, and the referee found, that the deputies threatened to arrest Darlene on that date. This threat, concluded the referee, prompted Darlene to falsely state that petitioner confessed to her at the Exxon station a day or two after Debbie disappeared. The referee based this conclusion on the following factors: (1) prior to December 4, Darlene had steadfastly maintained that petitioner had not confessed and her denials were credible; (2) Darlene wanted to avoid going to jail; (3) the confession itself was not credible because it described the three killings in exactly the same manner; (3) the confession was rife with inconsistencies; (4) the confession contained material inaccuracies, such as the location where the murders occurred; and (5) there were no verifiable facts in the confession that were not already known to law enforcement. We accept this finding as true because it is supported by substantial evidence.

#### ii. *View from the Hill*

The referee also concluded that Darlene falsely testified at trial that while smoking a cigarette on a hill near the foster home the night Denise disappeared, she saw petitioner pick up Denise in his vehicle. The referee based this finding on the following factors: (1) Darlene did not tell this fact to the sheriff's deputies throughout the interrogations, including the December 4 interrogation; (2) she disclosed this information for the first time just days before she testified at the jury trial; and (3) the referee visited the location and found that there were ample places to smoke just outside the foster home, on a cold night, without walking to the hill that overlooked the area of the underpass. We accept this finding as true.

#### iii. *The Key Chain*

Finally, the referee did not believe Darlene's statement at trial that she found Debbie's unicorn key chain in petitioner's car on the date of the claimed confession, because he believed that the confession never occurred. The referee also found it significant that the key chain had no keys on it, which suggested that Debbie did not carry it on her person. Moreover, Darlene repeatedly referred to the key chain as belonging to both Debbie and Denise. We accept this finding as true.

### b. *Incriminating Statements by Darlene*

As noted, the referee found that, prior to December 4, many statements made by Darlene that incriminated petitioner were true because they were

corroborated by physical evidence or witness testimony that the referee found credible.[5] Because they are based on substantial evidence and the referee's credibility assessments, we accept the referee's findings that (1) petitioner stated to Darlene that he did not know Lynda, but did know her parents; (2) petitioner stated to Darlene he would "eliminate three from the foster home and three more"; (3) in speaking to Darlene, petitioner referred to Denise and Debbie as "whores," "tramps" and "sluts"; (4) the night Denise disappeared, Darlene witnessed petitioner "cleaning his gun and sharpening his knife" and he said to her he was "going to take care of business" (the referee rejected as "ridiculous" Darlene's explanation at the reference hearing that petitioner made this statement in the context of a poker game); (5) the night Debbie disappeared, Darlene witnessed petitioner pull a knife from his car's sun visor, put it in his pants, and say to her he "had to take care of business"; (6) Darlene observed that petitioner had a deep fingernail scratch on his chest and scratches on his face around the end of June or early in July of 1984, which coincided with the time Lynda disappeared; and (7) Darlene and petitioner saw Debbie at Benham Park the night Debbie disappeared, and petitioner took Darlene home unusually early that evening.

### D. The Referee's Findings: Kathy Erbe

■ Petitioner contends that his conviction is unconstitutional because the prosecution withheld evidence of a conversation it had with Kathy Erbe, in which she claimed that Joe and Linda Crespin testified falsely at petitioner's jury trial. The referee found that Kathy Erbe was the "epitome of noncredibility." He found that she testified at the reference hearing in a confused manner, made assertions that could not possibly be true, and that *her* obsession with satanic cults affected her perception and memory.[6] Just as important, Erbe's claims were vehemently denied by Joe and Linda Crespin, district attorney investigator Ernie Birtwell, and witnesses Sonia and Kip Miller, all of whom the referee found substantially more credible than Erbe. The referee found that none of the statements attributed by Erbe to Joe and Linda Crespin were ever made. These factual findings are entitled to great deference, especially as they required the resolution of witness credibility. (*In re Malone, supra,* 12 Cal.4th at p. 946.) The referee's findings also are supported by substantial evidence.

---

[5]The referee also concluded that Darlene's statements to the sheriff's deputies prior to the December 4 interview were not the product of coercion and were voluntarily given. This finding is supported by substantial evidence and we accept it as true.

[6]As noted by the referee, the cult story was thoroughly investigated, and rejected by three different agencies, the Placerville Police Department, the El Dorado County Sheriff's Department, and the district attorney's office, and by defense investigator Larry Fuller on behalf of petitioner.

Because Erbe provided no relevant or material information to the prosecution, it follows that the prosecution had no duty to disclose such information to the defense. (*Brady v. Maryland* (1973) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215].) We therefore reject petitioner's contentions regarding Kathy Erbe.

### E. *The Referee's Findings: Linda Crespin*

Petitioner contends that Linda Crespin gave false testimony that was substantially material when she testified at trial that petitioner said he was seeing a girl named Lynda and that "girls like that should be eliminated." The referee determined that Linda Crespin testified truthfully at trial. He based this finding on the fact that Linda Crespin had testified at the preliminary hearing that petitioner used the word "eliminated"; at trial, she explained that she thought about it "a thousand times" and was sure petitioner used the word "eliminated"; Darlene and Patricia Kelly also testified they heard petitioner use the word "eliminated"; and the referee found that Linda Crespin's reference hearing testimony regarding the word "eliminated" was suspect. We accept the referee's finding regarding Linda Crespin and therefore reject petitioner's contention that Linda Crespin testified falsely at trial.

### F. *Materiality of the False Evidence*

Although the referee found that Joanna testified truthfully at trial that she saw petitioner chase and stab Denise, he found that Joanna falsely testified that a person named Joe drove her back to Placerville after the stabbing. ██ The referee also found that Darlene falsely testified at trial that petitioner confessed to her that he committed the murders, that she saw Denise get into petitioner's car the night Denise was murdered, and that she found Debbie's key chain in petitioner's car a day or two after Debbie disappeared.

#### 1. *Standard of Review*

██ Penal Code section 1473, subdivision (b)(1) provides that a writ of habeas corpus may be prosecuted if "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration . . . ."

"False evidence is 'substantially material or probative' if it is 'of such significance that it may have affected the outcome,' in the sense that '*with reasonable probability* it *could have* affected the outcome . . . .' [Citation.]

In other words, false evidence passes the indicated threshold if there is a 'reasonable probability' that, had it not been introduced, the result would have been different." (*In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527].) "The requisite 'reasonable probability' " is "determined objectively," is "dependent on the totality of the relevant circumstances," and must "undermine[ ] the reviewing court's confidence in the outcome." (*Ibid.*)

### 2. *Whether Petitioner Confessed*

In *Sassounian,* while we acknowledged that, in some cases, a confession can provide the prosecution with an " 'evidentiary bombshell which shatters the defense,' " its effect in a given case depends on whether a jury would have found it believable. (*In re Sassounian, supra,* 9 Cal.4th at p. 548, quoting *People v. Schader* (1965) 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665].) Because the *Sassounian* informant had been extensively impeached at trial, we believed it was "open to question" whether the jury found the confession believable. (*In re Sassounian, supra,* 9 Cal.4th at p. 548.) We therefore applied the reasonable probability test and determined that had the confession not been introduced, the result would have been the same. We concluded that there was no reasonable probability that admission of the confession could have affected the outcome because "[s]eparate and apart from the [confession] there was overwhelming evidence" supporting the conviction. (*In re Sassounian, supra,* 9 Cal.4th at p. 548.) We proceed to the same analysis here.

### *Darlene's Credibility Open to Question*

We determine, as a threshold matter, whether it is "open to question" whether the jury found the confession believable. We answer that question in the affirmative. In general, Darlene's credibility at trial was doubtful. She made several inconsistent statements during her direct testimony, and the record indicates that the prosecutor asked Darlene a substantial number of leading questions that required a simple "yes" or "no" answer. In addition, Darlene was extensively impeached on cross-examination. As the referee colloquially noted, Darlene's testimony "was torn to pieces."

For example, on direct examination, Darlene testified that petitioner had nothing to do with Debbie. But in response to the very next question, she stated petitioner would drive Debbie in his car. Immediately thereafter, she spoke about an incident that occurred on the night she and Debbie went to the convalescent hospital to visit Nona Chapman's husband. She testified that, while at the hospital, she tried to hide from Debbie; she then denied she

tried to hide from Debbie; when asked again, she reversed course once more and said she tried to hide from Debbie.

Darlene testified at trial that she recalled being at the Exxon station with petitioner and finding the unicorn key chain the day after Debbie disappeared. Initially, however, Darlene stated that the unicorn key chain belonged to Denise. When the prosecutor posed the question to her again, Darlene repeated that the key chain belonged to Denise. On the third try, she said the key chain belonged to Debbie. But thereafter, she again referred to the key chain as Denise's and again, at the prosecutor's prompting, changed her testimony to say that it was Debbie's key chain. On cross-examination, Darlene was still uncertain, stating that she put the unicorn key chain back in "Denise's—Debbie's" drawer.

Darlene's account of the confession was doubtful on its face. Darlene stated, as to Denise, that petitioner told her "[h]e had strangled her, stabbed her" and "[h]ad sexual intercourse with her." As to Lynda, Darlene stated in identical language that petitioner told her "[h]e had strangled her, stabbed her and had sexual intercourse with her." As to Debbie, she echoed that petitioner told her he had "strangled her, stabbed her and had sexual intercourse with her." She added that, as to all three victims, petitioner told her "[h]e had handcuffed their hands and tied their feet." Darlene's claim that petitioner told her the exact same thing as to all three victims is dubious. Her testimony also suggested that petitioner had sex with the girls after they were dead. Indeed, the trial court commented at sidebar that the "jury could only conclude that he killed [the victims] before he had intercourse with them." Darlene offered *no further details about the confession* other than to say "I don't know" when asked if petitioner had sex with the victims before or after he killed them. The prosecutor, significantly, asked no further questions about the confession, such as whether petitioner told Darlene where the murders took place, or how he got Lynda and Debbie into his vehicle. This utter lack of detail also makes the confession dubious.

Darlene's account of the confession also contained what appeared to be factual inaccuracies. On cross-examination, Darlene stated that petitioner told her Denise was running down a road, but also agreed that petitioner said he tied her feet. Defense counsel then asked her if petitioner tied Denise's feet before she started running. Darlene changed her story and said, "No, he didn't have time to tie up her feet." Darlene stated that petitioner told her he stabbed Denise in the stomach, but later stated petitioner told her he stabbed Denise in the chest. Darlene also stated that petitioner said he killed Denise and Lynda on North South Road. In fact, both girls were killed 12 miles away, on Ferrari Mill Road. We conclude, therefore, that it is "open to

question" whether the jury found the confession believable. (*In re Sassounian, supra,* 9 Cal.4th at p. 548.)

### 3. *False Evidence and the "Reasonable Probability" Test*

The false testimony introduced at petitioner's jury trial does not meet the reasonable probability test set forth in *Sassounian.* Not only was Darlene's testimony of petitioner's supposed confession highly suspect, as detailed above, but there was overwhelming evidence at trial, separate and apart from the items of false evidence, that amply supported the jury's verdict. In other words, had such false evidence not been introduced, it is reasonably probable the result would have been the same.

### a. *Murder Commonalities*

The murders of Lynda, Denise, and Debbie must not be viewed in isolation because there are many common threads that point to the fact that one person killed these three girls. For example, all three victims were teenagers who lived in Placerville, and Debbie and Denise lived in the same foster home. All three victims knew each other and "hung out" in downtown Placerville. All three victims were killed in the El Dorado National Forest within a two-month period in the late spring and summer of 1984 and the bodies of Denise and Lynda (who were murdered just 17 days apart) were found within a quarter-mile of each other. The bodies of all three victims were found unburied and naked, and their clothes were found nearby, not strewn about, but together. Because no blood was found on the victims' clothes, it can be reasonably inferred that all three were murdered while they were naked. These commonalities lead to the conclusion that the murders were committed by one person and the evidence presented at trial conclusively showed that that person was petitioner.

### b. *Petitioner's Incriminating Statements*

Evidence of petitioner's incriminating statements was admitted at trial. Several teenage girls testified that before Denise's murder, petitioner had contemptuously referred to Denise, Darlene, and Lynda as sluts. Darlene's mother testified that in September 1984 (after Denise's and Debbie's murders), petitioner volunteered that Denise and Debbie "were whores and tramps and they should have been killed." Also, about that same time after the murders, Patricia Kelly confided in petitioner that she suspected her husband was seeing another woman. Petitioner replied, "Whores like that should be eliminated"—the very same term he had used in referring to the victims. In November 1984, during a conversation about the murders of the

three victims, petitioner said to Joe and Linda Crespin, "If I had stabbed the three girls would I be sitting here talking to you now?" Significantly, petitioner referred to the cause of death as stabbing, even though none of the media accounts at the time had identified stabbing as the cause of death.

### c. *Murder of Denise*

As discussed above, we adopt the referee's finding that Joanna truthfully testified at petitioner's jury trial that she witnessed petitioner murder Denise. Our finding is based on the fact that Joanna offered information at trial that could have only been known by a person who was present when Denise was murdered. For example, on the first trip to the murder location with sheriff's deputies and Dr. Dougherty, a dark and snowy night with poor visibility, Joanna located Ferrari Mill Road, which was essentially an unmarked dirt road. Once on that dirt road, she originally directed the sheriff's deputies onto the wrong road at the "Y" fork, but then corrected herself. Once on the correct road, as the car went up a hill with ruts in it, Joanna stated that she remembered that hill. Once at Four Corners, she told them to stop. On the second trip to the murder location, Joanna recognized a tree stump marked with yellow paint just past Four Corners. Evidence subsequently was admitted to show that the stump had been painted yellow prior to the murder. She then pointed down a road at Four Corners and said that the night of Denise's murder "we went further down that road." This was the road off of which Denise's remains were located. The two newspaper articles that Joanna later claimed in her posttrial recantation to have read prior to these trips did not disclose which direction to take at the Ferrari Mill Road "Y" fork, did not describe the hill with ruts in it, and did not mention that the bodies were found at Four Corners, all of which Joanna knew when she led the sheriff's deputies to the site of Denise's murder.[7]

On the third trip to the murder location (with Sergeant Wilson on June 22, 1985), which was the first time Joanna led sheriff's deputies down the road off of which Denise's remains were located, she accurately predicted they would "go over a small rise and drop down off this rise and [that] it would level out." She then told Sergeant Wilson to stop the car and proclaimed: "That's where [petitioner's] car was parked the night Denise was killed." This spot was within 75 yards of the murder scene. As noted, only a person

---

[7]Accordingly, we reject the dissent's claim that Joanna was able to direct the sheriff's deputies to the murder scene in November 1984 because "she knew from news reports the approximate location where loggers had found Denise's body one-half mile west of Ferrari Mill Road." (Dis. opn., *post*, at p. 1029.)

who was present when Denise was murdered would possess such specific knowledge.[8]

Joanna's trial testimony was corroborated in several critical respects. Joanna testified at trial that there was a trickle of water in the area where she vomited. Just prior to the murder, it rained for four consecutive days. The People's expert testified that, given the rainfall, he would expect shallow puddles in the area where Denise was murdered on June 12. Joanna testified at trial, for the first time on cross-examination, that there was a full moon the evening of June 12. In fact, evidence later admitted at trial showed it was one night before a full moon.[9]

Joanna also testified at trial that Denise was naked, running with her hands behind her back, when petitioner stabbed her. Denise's clothes were found apart from her body, corroborating Joanna's testimony that Denise was naked; petitioner kept a knife above his car's sun visor and showed it to Darlene on the night of Denise's murder, saying "[t]onight is going to be a good night for business," corroborating Joanna's testimony that Denise was stabbed; and petitioner kept handcuffs in his car, corroborating Joanna's testimony that Denise was running with her hands behind her back. This corroborating evidence reinforces the conclusion that Joanna witnessed petitioner murder Denise.[10]

---

[8]The dissent claims that the "circumstances of [the June 22, 1985] trip [to the murder location] are highly suspect" based largely on the belief that Sergeant Wilson's "credibility is in question." (Dis. opn., *post*, at pp. 1029, 1030.) But the referee, who observed Sergeant Wilson testify at the 1994 reference hearing, found that "in describing his observations and conduct in the area of Ferrari Mill Road . . . he was an able, ingenious and honest police officer." This "assessment of witness[] credibility" is entitled to great deference. (*In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299].) Unlike the dissent, we will not "second-guess" the referee's credibility finding as to Sergeant Wilson.

[9]The dissent claims that the "circumstance of Bruce Nesthus's reversible jacket" lends support for the conclusion that Joanna falsely testified at trial because "when she described what Denise was wearing on the night of her death, Joanna made no mention of Denise wearing a man's black-and-orange jacket." (Dis. opn., *post*, at p. 1030.) But the person who found the jacket described it as a "reversible [jacket] either dark blue or black on one side and orange on the other." Thus, Denise was likely wearing what appeared to be a dark blue or black jacket. This would hardly have been distinctive and Joanna's failure to mention the jacket is not significant.

[10]The dissent, by highlighting the fact that the jury heard that Joanna had lied to the police about Denise's disappearance in the spring and summer of 1984, that Joanna applied for a reward, and that the prosecutor suggested to the jury that it could take Joanna out of the case and still convict, concludes that *Darlene's* false testimony is material because "the record of petitioner's capital trial reveals substantial problems with Joanna's testimony that she saw petitioner kill Denise." (Dis. opn., *post*, at p. 1032.) But the dissent overstates the case. The *prosecutor* highlighted the fact that Joanna decided to tell the truth only after seeing the yellow paint on the tree stump on November 7, 1984. Moreover, petitioner did not establish

Finally, although there was only media speculation about the cause of death, Joanna knew that petitioner had *stabbed* Denise—she told law enforcement so in early November 1984. Also, in early November 1984, petitioner said to Joe and Linda Crespin, "If I had stabbed the three girls would I be sitting here talking to you now?" Those corroborative statements, made independently of each other and at about the same time, strongly support the referee's finding that Joanna's eyewitness testimony was reliable.

#### d. *Murder of Lynda*

Several witnesses testified that petitioner was the last person to be seen with Lynda, who stated she would be "right back" as she left with petitioner. And despite the testimony from several witnesses that petitioner knew Lynda, petitioner, on July 5, 1984, told Donald Burrill, Lynda's father, that he did not know Lynda and even denied being in town the evening she disappeared. When El Dorado Sheriff's deputy Detective William White interviewed petitioner two weeks later, petitioner changed his story and said he might have been with Lynda that night. Additionally, the day after Lynda disappeared, Linda Crespin observed him with a scratch on his forehead to which he applied medicine. Petitioner also admitted, the day after Lynda's disappearance, that he had been seeing or dating a girl named Lynda, but stated that "girls like that should be eliminated."

Finally, Lynda and Denise were murdered just 17 days apart, in the same manner, and at the same location, Ferrari Mill Road. Petitioner was very familiar with Ferrari Mill Road, having camped there several times.

#### e. *Murder of Debbie*

At trial, witnesses offered the following testimony. Petitioner said Debbie was "turning out real bad" and had threatened Debbie several days before her disappearance. Referring to Debbie, petitioner said shortly before her disappearance "You won't have to worry about her much longer."

---

that Joanna was aware of any reward *prior* to her return to Placerville from Washington on October 29, 1994. Finally, even though the prosecutor told the jury that it could "hypothetically take Joanna" out of the case, he immediately told the jurors *not* to put her testimony aside. Specifically, in his rebuttal argument, the prosecutor stated that "if you take Joanna [N.] and put her aside . . . there is still a ray of evidence through which there runs a common thread that speaks with strong and compelling force as to the guilt of [petitioner]." But he added in the very next sentence, "Now I don't say to put Joanna [N.] aside. I say judge her testimony by what you saw. Judge her testimony by the evidence." The prosecutor did not diminish the importance of Joanna's testimony. Obviously, Joanna's corroborated eyewitness testimony that petitioner stabbed Denise to death was the most damning evidence against petitioner.

On the night Debbie disappeared, petitioner's car was observed driving by Benham Park "real slow" and the driver was seen "looking through the park" at the same time Debbie was at the park attending a party for a friend. Darlene confirmed that she and petitioner were sitting on a picnic bench in the park that evening for about 15 minutes, and *she* saw Debbie in the park. Yet, four days after Debbie disappeared, petitioner denied seeing Debbie in. Benham Park that night. Darlene further stated that, during that evening, petitioner pulled a knife from his car's sun visor and put it in his pants, saying "he had to take care of business." Petitioner took Darlene back to the foster home "unusually" early. Debbie walked home alone after the party because her friends left her after walking her just "some of the way" home.

Finally, as in the case of Lynda and Denise, petitioner was familiar with the area where Debbie's body was found, Camp Creek on North South Road, as he camped and cut wood there on several occasions.

### f. *Conclusion*

Based on the foregoing evidence, it cannot be said that any of the false statements, viewed separately or together, were substantially material or probative on the issue of guilt or punishment. It is not reasonably probable, therefore, that the result of the trial, had the jury not heard the false statements, would have been different. Our confidence that the jury reached the proper verdict is therefore not undermined. (*In re Sassounian, supra,* 9 Cal.4th at p. 546.)

## V. CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

We asked the referee to determine whether Defense Counsel Patrick Forester's pretrial investigation of Darlene's credibility was conducted in a manner to be expected of reasonably competent attorneys acting as diligent advocates. If not, we inquired how his investigation was inadequate, and what additional information an adequate investigation would have disclosed. The referee's finding that trial counsel's performance was inadequate in certain respects but not prejudicially so is a mixed question of law and fact that is subject to our independent review. (*In re Hamilton, supra,* 20 Cal.4th at pp. 296-297.)

### A. *Standard of Review*

"When the basis of a challenge to the validity of a judgment is constitutionally ineffective assistance by trial counsel, the petitioner must establish . . . counsel's performance fell below an objective standard of

reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome." (*In re Visciotti, supra,* 14 Cal.4th at pp. 351-352.)

"[T]he petitioner must establish 'prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel. [Citation.] . . . The petitioner must demonstrate that counsel knew or should have known that further investigation was necessary, and must establish the nature and relevance of the evidence that counsel failed to present or discover.' [Citation.] Prejudice is established if there is a reasonable probability that a more favorable outcome would have resulted had the evidence been presented, i.e., a probability sufficient to undermine confidence in the outcome. [Citations.] The incompetence must have resulted in a fundamentally unfair proceeding or an unreliable verdict. [Citation.]" (*In re Clark* (1993) 5 Cal.4th 750, 766 [21 Cal.Rptr.2d 509, 855 P.2d 729].)

 There were several questions explored regarding whether Attorney Patrick Forester conducted a competent investigation. The referee considered whether counsel should have (1) subpoenaed Darlene's medical, psychiatric and education records; (2) personally interviewed Darlene; (3) had his investigator interview Darlene's friends and family; (4) retained a mental health professional; (5) transcribed, for purposes of cross-examination, Darlene's November 9 and December 4 taped interviews with deputy sheriffs; and (6) retained a police interrogation expert in light of the content of those tapes.

## B. Forester's Testimony

### 1. Failure to Subpoena Records

Forester did not attempt to obtain Darlene's school records because he did not believe "they really [would have] added anything." He did not subpoena Darlene's county health or mental health records because at that time, those records were generally not discoverable. He did not subpoena Darlene's psychiatric records because he had a "clear understanding" of her psychological profile and did not think such records were necessary in this case.

### 2. Failure to Interview Witnesses

Forester testified that Darlene stated to him, prior to the preliminary hearing, that she did not want to talk to him. Forester added that it was the trial prosecutor's practice to instruct witnesses that they did not have to talk

to the defense, and thereafter, "they didn't talk to us, even when we attempted to talk to them." On one occasion, his investigator, Larry Fuller, saw Darlene in the district attorney's office alcove and tried to talk to her, and District Attorney Ron Tepper "went ballistic." Forester stated that Darlene would not talk to the defense. Other potential witnesses were hostile to the defense as well, and would not provide information. Darlene's parents were hostile towards the defense. The only person who did cooperate was Joe Crespin.

### 3. Tactical Considerations

Forester stated he had considered hiring a psychologist or psychiatrist, but he did not think it was necessary in this case.[11] He explained that he "kn[e]w [petitioner] confessed his crime to nobody because that was just not [him]," and that he did not confess to Darlene because she married him after the alleged confession. Instead, Forester believed that Darlene was present at the three homicides, which, given her grant of total immunity, presented a problem "all along" in cross-examination because it "wouldn't help [petitioner] a lot for her to confess that she was in fact present when he did all these murders." Forester added: "So I think all of my cross-examination and the investigation of her background or her psychiatric profile was tempered by that problem." Forester outlined his trial strategy: "I had my own theory and my own trial tactics with respect to the case as to her. And my problem was that I believed, and to this day I believe, she was present when all these things were committed." Forester added that he did not need a psychiatric expert to tell him that the reason Darlene went to a psychiatric unit after Debbie's disappearance was "a result of the fact that she had participated in these offenses." When asked whether a report that stated Darlene was delusional would have assisted his cross-examination, Forester replied: "I do not believe her to be a delusional person and I would not have retained a psychiatrist to establish something that I didn't believe."

Forester provided his reasons for his belief that Darlene was involved: "She was described in the trial as [petitioner's] automation [sic: automaton] by [the trial prosecutor] and I . . . would agree with that. That she did whatever [petitioner] wanted her to do. That she was there when he wanted her to be there. And that she was always with him when he wasn't working and when she could get away from the foster home. She was with him all the time." And as petitioner had only one friend in town, Joe Crespin, and "everybody [else] in town really hated him," Forester felt that none of the victims would have gotten into petitioner's car unless Darlene was present.

---

[11]Forester stated that he never considered consulting with someone who had expertise in police interrogation techniques.

Forester acknowledged that "of course" Darlene had never admitted being present at the murders during her interrogations, the preliminary hearing, or the trial.

### 4. *Failure to Transcribe Tapes*

Neither Forester nor the prosecutor had transcripts prepared of Darlene's three November 9 taped interviews or the December 4 taped interview with the sheriff's deputies. Forester said he listened to all of the tapes four or five times. He also reviewed the reports associated with each tape. He said he made notes of the tapes, but he could not find them in his files. He thought Darlene was easily led and he thought she was trying to please the investigators because she was, in fact, involved in the murders.

Forester bridled at the suggestion he was "lazy" for not having the tapes transcribed. When the referee asked him whether it would have been better to put the tapes before the jury, Forester explained it was "just a question of technique." He believed the reports adequately summarized the tapes and he believed Darlene's cross-examination was based on all the information before him, including the tapes. When the referee persisted that playing the tapes would have been a more effective method of cross-examination, Forester disagreed. To his thinking, Darlene, under police pressure, told police about petitioner's "confession" because she was present at the murders. Forester stated, "Isn't that why she really broke down in the end?"

### C. *The Referee's Findings*

#### 1. *Adequacy of Counsel's Performance*

The referee concluded that Darlene and other witnesses, such as Darlene's family and friends, would not have talked to Forester prior to trial. He concluded that, based on the law at that time, the defense would not have been able to obtain Darlene's county mental health or psychiatric records (or a psychiatric examination). He also concluded that Forester was under no obligation to hire a police interrogation expert to undermine a prosecution witness's testimony.

However, the referee believed that Forester's investigation was inadequate because he failed to obtain Darlene's school records, which were available pursuant to the Education Code. (Ed. Code, §§ 49076-49078.) These records contained information that Darlene had a low IQ (in 1984, Darlene had a verbal IQ of 72), believed in mystic control, believed she had supernatural powers, and had a vivid imagination. The referee concluded that this information should have been available to the jury in considering Darlene's

credibility. Forester would then have had sufficient reason to hire a psychiatric expert to potentially exploit this information.

Forester's main investigative deficiency, stated the referee, was not having the tapes of the interviews transcribed, as they "constituted a goldmine for investigation of credibility." For example, the tapes showed that Darlene told the deputies 15 to 20 times that petitioner did not confess, and it was only when Darlene was threatened with arrest at the December 4 interview that she produced a "confession." The tapes also showed that Darlene was suggestible; that there were several versions of the confession; and that she was often prompted by the deputies or her mother.

The referee believed that Forester's belief that Darlene was an accomplice was based on an inadequate investigation, was contrary to known facts, and should not have precluded him from obtaining school records or obtaining a transcript of the November 9 and December 4 interrogations. The referee also found that the reports did not adequately summarize the tapes, and that Forester should have cross-examined the sheriff's deputies on the arrest threat.

### 2. *Prejudice*

The referee concluded, however, that petitioner was not prejudiced by these investigative inadequacies because there was no reasonable probability of a more favorable outcome because Forester's "searing" cross-examination exposed Darlene's poor memory, the inconsistencies between her direct testimony and cross-examination, the lack of detail, her failure to recall, and her suggestibility. The referee stated that "[b]ecause the cross-examination utterly destroyed the believability of the 'confession' story, the petitioner cannot meet the legal standard required to show prejudice."

### D. *Discussion*

■ There are two components to an ineffective assistance of counsel claim: deficient performance of counsel and prejudice to the petitioner. *Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 2069, 80 L.Ed.2d 674], informs us that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

 Accordingly, we need not grade counsel's performance here because we agree with the referee's finding that petitioner was not prejudiced by counsel's alleged deficiencies. First, the confession itself was dubious because it lacked detail, described each murder in an identical manner, and contained factual inaccuracies. Darlene's credibility was also eroded because she made several inconsistent statements during her direct testimony, was constantly asked leading questions, and defense counsel further exposed her poor memory, her factual misstatements, and her suggestibility. That Darlene testified under a grant of immunity further eroded her credibility to the jury.

The referee observed Darlene testify at the reference hearing. After seeing her demeanor, and hearing her inflections, her tone of voice, and her hesitations, he concluded that Darlene was an unconvincing witness. She had obvious mental limitations (as noted above, an IQ of 72, difficulty in comprehension, frequent confusion and losses of memory) and was prone to suggestibility. She laughed frequently at inappropriate moments, which the referee acknowledged also had occurred in law enforcement interviews prior to the jury trial. As noted, the referee's observations of Darlene's manner of testifying at the reference hearing and his assessment of her credibility are entitled to great weight. (See, e.g., *In re Hamilton, supra,* 20 Cal.4th at pp. 296-297.) Defense Counsel Forester also observed that, at the jury trial, Darlene was not responsive to his cross-examination questions and "didn't seem to track and understand the simplest of questions." Based on the foregoing, we believe that the referee reasonably inferred that the jurors likely witnessed the same limitations at trial and discounted Darlene's confession testimony.

To establish prejudice, there must be a reasonable probability that a more favorable outcome would have resulted if counsel had transcribed the tapes or had obtained Darlene's school records. (*In re Clark, supra,* 5 Cal.4th at p. 766.) Petitioner has not met this burden.

## VI. DISPOSITION

For all of the foregoing reasons, the order to show cause is discharged. The petition for writ of habeas corpus will be resolved, as is our normal procedure, by a separate order.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J., Dissenting.**—Petitioner was convicted of three murders and sentenced to death almost entirely on the trial testimony of two teenage girls, Darlene S. and Joanna N. Both of these crucial trial witnesses have since admitted under oath, at a habeas corpus reference hearing ordered by this court, that their trial testimony against petitioner was false. The majority acknowledges that Darlene's trial testimony was false, and it agrees with the referee (a retired superior court judge) that petitioner has shown Joanna to be a chronic liar and manipulator. The majority nonetheless concludes that we should accept Joanna's trial testimony as truthful and reject her later recantation as false. The majority reaches this conclusion by drawing a series of inferences from facts in the record.

I disagree. Because the punishment of death differs from all other criminal punishments both in its severity and in its finality, there is a special need that judgments in capital cases rest on evidence that is substantial, credible, and reliable. (See *Ford v. Wainwright* (1986) 477 U.S. 399, 411 [106 S.Ct. 2595, 2602-2603, 91 L.Ed.2d 335] (plur. opn.).) Darlene's trial testimony did not provide credible evidence of petitioner's guilt because, as the majority concedes, that testimony was false. Joanna's trial testimony is highly suspect because, as the referee found, she is a chronic liar. Unlike the majority, as I will explain, I find nothing in the record before this court to provide the necessary reassurance that Joanna testified truthfully at petitioner's trial. I would not send petitioner to his death on such flimsy evidence.

I

A. *Background*

During the summer of 1984, three teenage girls (Lynda Burrill and sisters Denise and Debbie Galston) disappeared from the town of Placerville in El Dorado County. Their decomposed remains were later discovered in the nearby El Dorado National Forest. Public suspicion focused on petitioner, a 27-year-old loner who lived in his car.

At the end of October 1984, when a deer hunter found the decomposed remains of the third victim, Debbie, the prosecution did not have enough evidence to charge petitioner with *any* of the three murders. No physical evidence tied him to any of the killings. And the circumstantial evidence implicating him was quite weak: All three victims frequented The Oz, a local video game arcade and teenage hangout, as did petitioner; petitioner had expressed his dislike of the Oz-crowd girls, making callous and threatening remarks about them; he was seen with victim Lynda the night she disappeared, and the next day he had a scratch on his forehead; he told contradictory stories about whether he knew Lynda; he kept knives, guns, and

handcuffs in his car; and he had camped and logged in the forested areas where the bodies were found.

### 1. *Joanna N.'s accusations*

In late October 1984, Joanna N. talked to El Dorado County Sheriff's deputies Detective Erol Harnage and Sergeant Bill Wilson. Joanna had been a friend of victims Denise and Debbie Galston, as they all lived in the same group foster home. Joanna told the sheriff's deputies she knew "something" about the murders. Because she seemed unwilling to say more, the deputies had her meet with a psychologist, Dr. Frank Dougherty, Chief of the El Dorado County Mental Health Department, in the hope that she would feel more comfortable discussing what she knew about the murders with him.

Joanna saw Dr. Dougherty on November 1, 1984, and told him that petitioner had killed Denise. Eventually, she accompanied Dr. Dougherty and the sheriff's deputies on two trips to the forest where loggers had found Denise's body. During the second trip to the murder scene, Joanna said she had seen petitioner kill Denise. The next day, November 7, Joanna described petitioner's stabbing of Denise.

### 2. *Darlene S.'s accusations*

During the summer of 1984, Darlene S., who was then petitioner's girlfriend, lived in the group foster home with victims Denise and Debbie. On November 9, Detective Harnage and Sergeant Wilson brought Darlene to the sheriff's station for an interview. They asked Darlene if she knew anything about the murders. She insisted she did not, and she continued to do so in a series of interviews conducted throughout November. But on December 4, Darlene told the sheriff's deputies that a couple of days after Debbie's disappearance, she had found a key chain belonging to Debbie in petitioner's car, and that when Darlene showed the key chain to petitioner, he had admitted killing Debbie, Denise, and Lynda.

In May 1985, petitioner's case went to trial on three counts of capital murder. Joanna and Darlene testified for the prosecution.

### B. *Joanna's Trial Testimony*

At petitioner's trial, Joanna told this story:

In the early evening of June 12, 1984, Joanna, Denise, and several other young people were at a "wandering party" in downtown Placerville. At some

point, the party moved to a place outside a car dealership. Joanna noticed petitioner drive by, and shortly thereafter saw Denise heading home. Denise walked toward the freeway underpass and then got into petitioner's car. Petitioner then picked up Joanna, telling her they were going to "a party."

After heading east on Highway 50, they stopped on a dirt road off Mormon Emigrant Trail. Joanna got out, walked uphill, and vomited. While washing her face in "a little trickle of water, a stream," she heard Denise scream. From a distance of 55 to 60 feet in the moonlit night, Joanna saw Denise run from petitioner. Denise was naked and had her hands behind her back as if bound. Petitioner caught Denise, pushed her down, pulled a knife, and stabbed her. Joanna fled through the forest, making her way back to Mormon Emigrant Trail. There, she hid from an approaching car, fearing it might be petitioner. She then hailed the next car and got a ride back to Placerville from a young man named Joe, whom she had previously met at a local teen dance club. Back in Placerville, Joanna encountered Bruce Nesthus, who had been at the "wandering party" with her earlier. She spent the rest of the night at his house. Not until five months later, when she talked to Dr. Dougherty, Detective Harnage and Sergeant Wilson, did Joanna reveal to anyone her eyewitness account of Denise's murder.

### C. *Darlene's Trial Testimony*

At petitioner's trial, Darlene gave this account:

In the spring and summer of 1984, petitioner often referred to victims Denise and Debbie Galston as "sluts." Once petitioner told Darlene, "[t]hree [will] be eliminated from the foster home" where the sisters lived "and three more."

On June 12, 1984, the day of Denise's disappearance, Darlene spent the early evening with petitioner. Around 10:00 p.m., petitioner took Darlene back to the group foster home. When she went outside to smoke, she saw petitioner's car near the freeway; moments later, Denise entered petitioner's car. A few days thereafter, Darlene told petitioner that Denise never came back to the foster home. He told her not to worry.

Denise's sister Debbie was last seen on August 8, 1984. A day or two later, while cleaning petitioner's car, Darlene found a unicorn key chain belonging to Debbie. After she confronted petitioner with the key chain, he admitted that he strangled and stabbed Denise, Debbie, and Lynda.

## II

### A. *Joanna's Recantations*

In his petition for writ of habeas corpus and later at the reference hearing this court ordered, petitioner presented evidence that Joanna had lied at his capital trial. Petitioner offered declarations by three people that Joanna had told them that her trial testimony was false. The declaration by Allen Dwyer, who had been married to Joanna between 1987 and 1989, stated that during the brief marriage, Joanna several times said that on the night Denise disappeared, Joanna was not with petitioner nor did she see him kill Denise, and that she had passed out drunk in a park in downtown Placerville. Declarations by Dwyer's mother, Anita Hoosier, and a friend, Laura Lawrence, asserted that Joanna had made similar comments to them.

In response, the Attorney General prepared a declaration, which Joanna signed on May 10, 1990, denying ever telling anyone that she had lied at trial.

On January 16, 1992, Joanna appeared with counsel at the El Dorado County District Attorney's Office. The district attorney granted Joanna immunity from prosecution for any false testimony at petitioner's preliminary hearing or trial or in her May 10, 1990 declaration. Then, in a tape-recorded deposition, Joanna recanted her trial testimony about Denise's murder. Specifically, Joanna denied that the night of June 12, 1984, she saw Denise get into petitioner's car, that moments later, petitioner picked her up, and that the three then drove to a remote area where petitioner stabbed Denise. Joanna acknowledged encountering Bruce Nesthus early the next morning and sleeping at his house, but she could not remember the exact time that she met him because she was drunk and under the influence of drugs. According to Joanna, she told the sheriff's deputies that she witnessed Denise's murder because she believed petitioner had killed Denise, as well as Lynda and Debbie.

Some two years later, at the reference hearing in February 1994, Joanna again recanted her trial testimony. She testified that she made up the story about witnessing petitioner kill Denise because of her own suspicions about petitioner and because of pressure put on her by Detective Harnage and Sergeant Wilson.

Joanna mentioned telling Kenny Moulton, her boyfriend at the time of the trial, that she had lied at trial. She also said so to her ex-husband (Allen Dwyer), his mother, and Laura Lawrence, the three people who provided declarations in support of the petition.

Joanna said that during the trial she became good friends with Sergeant Wilson and his wife Sherry. Sometime after the trial she told Wilson that her trial testimony about *seeing* petitioner stab Denise was untrue (she claimed to have only *heard* Denise's screams), and that she did not ride back to Placerville with *Joe* (someone she had previously met at a teen dance club) but rather with *petitioner*.

Joanna said she delayed telling the district attorney that she had lied at trial because she was afraid that he would prosecute her for perjury and that ex-husband Dwyer would gain custody of their children. She eventually decided to reveal her false testimony because she wanted to clear her conscience and because of significant changes in her lifestyle, explaining that she no longer used drugs or alcohol, and that she had become a practicing Christian.

B. *The Referee's Findings Regarding Joanna's Trial Testimony*

This court asked the referee to determine whether Joanna's trial testimony was false. He made these findings: Joanna was a chronic liar, who throughout her life had made up elaborate and creative falsehoods. The referee nonetheless concluded that Joanna had *not lied* about seeing petitioner kill Denise. But he disbelieved Joanna's trial testimony that she fled through the forest and hitched a ride back to Placerville with someone named Joe. Based on his personal observation of the steep and rugged terrain, the referee concluded that it would have been impossible for Joanna to make her way from the murder site to the paved highway. Because petitioner's jury at the trial had visited the murder scene, the referee considered it highly unlikely that the jurors would have believed Joanna's testimony about how she got back to Placerville and thus would not have considered that testimony in finding petitioner guilty of Denise's murder. For that reason, the referee concluded that the false part of Joanna's trial testimony was not material.

In the referee's view, there was no way for Joanna to have returned from the murder scene to Placerville other than riding back with petitioner. He posited that Joanna thought she could be prosecuted as an accessory to murder for having done so. That, the referee said, would explain Joanna's initial reluctance to tell Detective Harnage and Sergeant Wilson about seeing petitioner stab Denise.

The referee believed Joanna's reference hearing testimony that sometime after petitioner's trial she told Sergeant Wilson that she had lied about seeing petitioner stab Denise (she had only heard screams) and about riding back to Placerville with Joe (she rode back with petitioner). But the referee disbelieved Joanna's claim to Wilson that she had only *heard* but not *seen* the

murder. That, according to the referee, was just another posttrial attempt by Joanna to distance herself from the murder.

## C. *Darlene's Recantation*

After she was granted immunity for any perjury committed at petitioner's preliminary hearing and capital trial, Darlene testified at the reference hearing that key aspects of her trial testimony were false. Specifically, she denied that petitioner ever told her he had killed any of the three girls; thus, her trial testimony attributing these admissions to petitioner was false. Also, contrary to her trial testimony, she did not see Denise get into petitioner's car on the night of June 12, 1984, when Denise disappeared. Petitioner never told her "[t]hree [will] be eliminated from the foster home and three more." (See p. 1023, *ante.*) And contrary to her trial testimony, Darlene found Debbie's unicorn key chain in petitioner's car after petitioner and Darlene had given Debbie a ride, well before Debbie's disappearance. Darlene immediately returned the item to Debbie.

Darlene explained at the reference hearing that although petitioner did refer to sisters Denise and Debbie Galston as "sluts," he did so because they kept hanging around with Joanna, who reputedly was "going to bed with every guy" at The Oz video game arcade.

Darlene said that during her interrogations by Detective Harnage and Sergeant Wilson throughout November 1984, she repeatedly told them she knew nothing about the killings, but "they wouldn't accept it." The two sheriff's deputies accused Darlene of involvement in the murders, saying she was part of a "conspiracy" and could be sent to prison. Although her mother and stepfather were present at these sessions, Darlene testified that she was afraid of her stepfather, who hated petitioner and had sexually abused Darlene since she was 10.

Between an interview session with the prosecutor on November 15, 1984, when Darlene denied knowing anything about the murders, and her taped interview with Detective Harnage and Sergeant Wilson on December 4, when she said petitioner had told her he killed the three girls, the two questioned her "off the record" for five to six hours each day. Because Harnage and Wilson kept "harassing [her] and bothering [her]," Darlene said she finally changed her story to the one she gave at trial: That petitioner told her he had killed Denise, Debbie, and Lynda.

The transcript of the December 4, 1984, taped interview of Darlene by Detective Harnage and Sergeant Wilson, which was also introduced by

petitioner at the reference hearing, shows that the two sheriff's deputies went to Darlene's house and threatened her with arrest for "withholding information." In that interview, Darlene for the first time mentioned statements to her by petitioner admitting that he had killed the three girls.

## D. *Referee's Findings About Darlene*

In response to our question whether Darlene had given false testimony at petitioner's capital trial, the referee found that Darlene lied when she testified at trial (1) that she saw Denise enter petitioner's car the night Denise disappeared; (2) that she found Debbie's unicorn key chain in petitioner's car a day or two after Debbie disappeared; and (3) that petitioner told her he had killed Debbie, Denise, and Lynda.

The referee further found that "many manipulations of Darlene during the interrogation process" by Detective Harnage and Sergeant Wilson, culminating in their threat "to arrest her for 'withholding information' " led her to lie at petitioner's capital trial. The referee concluded, however, that Darlene's false testimony was not material because she was a poor witness who could not keep her story straight, and who was thoroughly impeached by defense counsel.

### III

## A. *Pertinent Legal Standards*

California law provides for issuance of the writ of habeas corpus if "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against [the petitioner] at any hearing or trial relating to his incarceration. . . ." (Pen. Code, § 1473, subd. (b)(1).)

The petitioner has the burden of establishing entitlement to relief and must do so by a preponderance of the evidence. (*In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Thus, to successfully mount a collateral attack, the petitioner must overcome the presumptions favoring the " 'truth, accuracy, and fairness of the conviction and sentence.' " (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].)

When this court orders a reference hearing, it is not bound by the referee's factual findings, although they are generally accorded great weight when supported by substantial evidence. (*In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299].) "Deference to the referee is called for on factual questions, especially those requiring resolution of testimonial

conflicts and assessment of witnesses' credibility . . . ." (*Ibid.*) This deference " ' "derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying." ' " (*In re Avena* (1996) 12 Cal.4th 694, 710 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

This court independently reviews the referee's resolution of legal issues and mixed questions of fact and law. (*In re Johnson, supra*, 18 Cal.4th at p. 461; *In re Cordero* (1988) 46 Cal.3d 161, 180-181 [249 Cal.Rptr. 342, 756 P.2d 1370].) Whether false evidence "is substantially material or probative" (Pen. Code, § 1473, subd. (b)(1)) calls for independent review because materiality presents a mixed question of fact and law. "Mixed questions are those in which ' "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." ' " (*People v. Cromer* (2001) 24 Cal.4th 889, 894 [103 Cal.Rptr.2d 23, 15 P.3d 243]; *People v. Louis* (1986) 42 Cal.3d 969, 984 [232 Cal.Rptr. 110, 728 P.2d 180].)

### B. *Materially False Testimony by Joanna*

On petitioner's claim that Joanna gave materially false testimony at his capital trial, the majority adopts the referee's findings and conclusions that Joanna lied only about how she got back to Placerville (see p. 1025, *ante*) and that her false testimony was not material. Thus, according to the majority, Joanna testified truthfully at petitioner's capital trial that on the night of June 12, 1984, she saw Denise enter petitioner's car; that petitioner turned around and picked up Joanna, telling her they were going to a "party"; that the three traveled to a forested area, where Joanna left the car and vomited; that shortly thereafter, she saw a naked Denise running with her hands behind her back as if tied, and petitioner chasing and ultimately stabbing Denise with a knife.

In reaching that conclusion, the majority highlights certain findings by the referee. We usually defer to a referee's factual findings when they are based on the referee's observation of witness demeanor at the reference hearing. (*In re Avena, supra*, 12 Cal.4th at p. 710.) Here, however, the referee's findings are based not so much on witness demeanor at the reference hearing but rather on a series of inferences drawn from the evidence presented at trial and at the reference hearing. These inferences do not warrant deference, as this court is in as good a position as a referee to draw logical inferences from evidence.

The majority relies on the referee's finding that at the 1994 reference hearing Joanna could give no details of her whereabouts on June 12, 1984

(the night Denise disappeared), between 9:30 p.m. and 3:00 or 3:30 the next morning (the approximate time Joanna encountered Bruce Nesthus with whom she spent the night). (Maj. opn., *ante*, at p. 1000.) I see nothing unusual about Joanna's inability to recall at the reference hearing details of events that took place *10 years* earlier. Bruce Nesthus's October 4, 1984, telephone interview with Detective Harnage is instructive on this point because it took place only *four months* after Denise disappeared. (Nesthus moved to another state before Denise's body was found and thus did not know she had been murdered.) Asked by Detective Harnage about "the twelfth of June" and "the drinking party [that] wound up down at [the auto dealership]," Nesthus replied, "I can't remember. It doesn't click in my mind."

In concluding that Joanna's trial testimony was essentially true, the majority points to her having directed the sheriff's deputies in November 1984 to the approximate location off Ferrari Mill Road where Denise's body had been found earlier. (Maj. opn., *ante*, at pp. 1001-1002.) But as Joanna explained at the reference hearing in 1994, she had previously lived on Sly Park Road off Highway 50 (near Ferrari Mill Road) and she knew from news reports the approximate location where loggers had found Denise's body one-half mile west of Ferrari Mill Road.

The majority also makes much of Joanna's ability on June 22, 1985 (her third trip to the scene of Denise's murder), to lead Sergeant Wilson to "within 75 yards" of the spot where loggers 11 months earlier had found Denise's body. (Maj. opn., *ante*, at p. 1003.) I am not persuaded. The circumstances of that trip are highly suspect.

Sergeant Wilson arranged the trip just days before the guilt phase of petitioner's capital case was to be submitted to the jury and right after the prosecution learned that a "critical piece" of evidence linking petitioner to Denise's murder—a man's reversible black-and-orange jacket found with Denise's clothes on April 30, 1985—belonged not to petitioner but to Bruce Nesthus. The prosecutor had already introduced evidence suggesting that petitioner owned the jacket when Nesthus (who by then had left California) returned to Placerville to testify. Nesthus inquired about a jacket he had lent to Denise at the "wandering party" on the night she disappeared. Shown the jacket found with Denise's clothes, Nesthus identified it as his and thereafter testified about lending Denise his jacket. When the prosecutor learned that the jacket was not petitioner's, he began "bouncing off the walls," as Sergeant Wilson testified at the reference hearing, for fear of losing the case. It was then that Sergeant Wilson took Joanna on one more trip to the scene of Denise's murder in the wilderness area outside Placerville in an effort to bolster the case against petitioner.

It is undisputed that on that June 22, 1985, trip, Sergeant Wilson drove straight to the intersection on Ferrari Mill Road, where he told Joanna to direct him to the place where she saw petitioner stab Denise. It is also undisputed that it was only on her third try that Joanna picked the road where Denise's body had been found. As Joanna explained at the reference hearing, "body language" hints by Sergeant Wilson helped her to pick the right location. The referee rejected Joanna's account, however, instead believing Sergeant Wilson's reference hearing testimony denying any *intent* to give Joanna hints about the location. Even so, in a last-ditch effort to make the case against petitioner, Wilson may have *unwittingly* used body language to hint to Joanna which road to take to the murder scene.

Moreover, Sergeant Wilson's credibility is in question. As the referee found, Wilson and his partner, Detective Harnage, had coerced the false testimony that Darlene gave against petitioner at his capital trial. (See p. 1027, *ante*.) Furthermore, although Wilson denied at the reference hearing that Joanna had ever mentioned to him after the trial that she lied at petitioner's trial, the referee accepted Joanna's testimony at the reference hearing that she told Wilson she heard Denise scream but did not see petitioner stab Denise, and that thereafter she rode back to town with petitioner rather than hitchhiking a ride from Joe as she had testified at trial. Implicit in the referee's finding is his conclusion that Wilson's reference hearing testimony on this point was false.

The circumstance of Bruce Nesthus's reversible jacket lends additional support to my conclusion that petitioner has, by a preponderance of evidence, proven the falsity of Joanna's trial testimony about witnessing petitioner kill Denise. Nesthus testified at trial that he lent the jacket to Denise at the wandering party (see p. 1029, *ante*) after she complained about being cold. The jacket was found together with the clothes Denise was wearing on the night she was killed. Thus, Denise must have worn the jacket when she left the party. Joanna testified at trial that when Denise left the party, she walked toward the freeway underpass and then got into petitioner's car. Curiously, in Joanna's many sessions with Detective Harnage and Sergeant Wilson in November 1984, when she described what Denise was wearing on the night of her death, Joanna made no mention of Denise wearing a man's black-and-orange jacket.

The referee had no persuasive explanation for Joanna's obvious reluctance at Darlene's initial interview by Harnage and Wilson on November 9, 1985, to tell Darlene about seeing petitioner kill Denise. (The two sheriff's deputies repeatedly asked Joanna to describe her crime scene observations to Darlene, but Joanna would not do so. Ultimately, the sheriff's deputies

revealed to Darlene what Joanna had told them about petitioner's killing of Denise.) The referee concluded that Joanna was reluctant to tell Darlene what she had seen because she was ashamed of not helping Denise escape from petitioner. It is more likely that, as Joanna testified at the reference hearing, she thought that Darlene, who had been petitioner's girlfriend, knew what had happened to Denise and would catch Joanna in a lie.

In my view, petitioner. has amply satisfied his burden of proving that Joanna's trial testimony that she witnessed petitioner kill Denise was a lie. Joanna repeatedly told others, including her ex-husband, his mother, a friend, and ultimately Sergeant Wilson, that she had lied at trial. And she twice under oath recanted her trial testimony, first at a recorded deposition by the El Dorado County District Attorney and later at the reference hearing.

Other than Darlene's testimony at trial that petitioner told her about killing the three girls (see p. 1023, *ante*), only Joanna's testimony put petitioner at the scene of any of the three murders. If believed by the jury, that testimony must have had a devastating effect on petitioner's defense. Accordingly, the evidence was " 'of such significance' " that with " 'reasonable probability' " (*In re Sassounian, supra*, 9 Cal.4th at p. 546), it affected the outcome on guilt and on penalty at petitioner's trial. Therefore, based on materially false testimony by Joanna, I would grant petitioner the relief he is seeking.

Even if I were to agree with the majority in rejecting Joanna's recantations of her trial testimony, petitioner would still be entitled to relief based on the materially false testimony of Darlene, as discussed below.

### C. *Materially False Testimony by Darlene*

The referee found that Darlene, petitioner's former girlfriend, had lied at petitioner's trial on three points: (1) that on the night of Denise's disappearance, Darlene saw Denise get into petitioner's car; (2) that a day or two after the disappearance of Denise's sister, Debbie, Darlene found Debbie's unicorn key chain in petitioner's car; and (3) that, when Darlene confronted petitioner with the key chain, he told her he had killed not only Debbie but also Denise and Lynda.

Was Darlene's false testimony "substantially material or probative" (Pen. Code, § 1473, subd. (b)(1)) on the question of petitioner's guilt of killing the three girls? As stated earlier, false evidence is substantially material or

probative if it is " 'of such significance that it may have affected the outcome,' in the sense that *with reasonable probability* it *could have* affected the outcome . . . .' [Citation.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 546.) As I explain, this test is met here.

Of Darlene's three lies, the most damaging to petitioner's defense was her testimony that petitioner told her about killing the three girls. This court has held that the erroneous admission of a confession is not reversible per se. (*People v. Cahill* (1993) 5 Cal.4th 478, 509 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) But as the United States Supreme Court has recognized, evidence of a confession has such a "profound impact on the jury" that appellate courts " 'may justifiably doubt [the jury's] ability to put [a confession] out of mind even if told to do so.' " (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296 [111 S.Ct. 1246, 1257, 113 L.Ed.2d 302].) To put it succinctly, a confession is "a kind of evidentiary bombshell." (*People v. Schader* (1965) 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665], overruled on other grounds in *People v. Cahill, supra,* at pp. 509-510, fn. 17.)

The majority concludes that Darlene's false testimony that petitioner told her he had killed the three girls was not substantially material because "overwhelming evidence at trial, separate and apart from [Darlene's false evidence] amply supported the jury's verdict." (Maj. opn, *ante,* at p. 1011.) In support, the majority relies first and foremost on Joanna's trial testimony that she "witnessed petitioner murder Denise." (*Id.* at p. 1012.)

I agree that Joanna's trial testimony, if accepted by the jury, together with the circumstantial evidence supporting petitioner's guilt, would amply support the determination that petitioner killed Denise, Debbie, and Lynda. But without Joanna's trial testimony, the circumstantial evidence was very weak.[1] Moreover, the record of petitioner's capital trial reveals substantial problems with Joanna's testimony that she saw petitioner kill Denise, thus calling into question whether the jury ever seriously considered that testimony in determining petitioner's guilt.

At the guilt phase of petitioner's capital trial, the jury heard that Joanna had lied to the police and others throughout the summer and fall of 1984 about the disappearance of Denise; defense counsel elicited from Joanna that

---

[1]At oral argument, the Attorney General stressed that the prosecution's trial evidence included the testimony of more than 70 witnesses in addition to Darlene and Joanna. Having reviewed the testimony of those other witnesses, I find it to be only peripherally relevant. None testified to having witnessed any of the three murders or to have heard petitioner confess to those murders.

in her interviews with the sheriff's deputies and with Dr. Frank Dougherty of the El Dorado County Mental Health Department she had "made up stories, lies, and other scenarios that never happened," repeatedly asking all three if she had given enough information to "get [petitioner] arrested"; and he established on cross-examination that shortly before Joanna told Detective Harnage and Sergeant Wilson she knew something about the murders, an $8,500 reward was offered for information leading to the conviction of the killer, and that after telling the sheriff's deputies she saw petitioner kill Denise, Joanna had applied for the reward.

Defense counsel also played for the jury a tape recording of Dr. Dougherty's initial interview with Joanna, whose account of her June 12, 1984 trip to the woods outside Placerville with murder victim Denise and petitioner differed greatly from her trial testimony describing that same event. Thus, at the close of the guilt phase of petitioner's trial, the prosecution must have realized there was a serious problem with the credibility of its star witness, Joanna. This is apparent from the prosecutor's argument to the jury describing "the credibility of Joanna" as a "major issue," and suggesting that the jury could "hypothetically take Joanna" out of the case and evaluate the evidence as if Joanna "never appeared before this jury and . . . ha[d] nothing whatsoever to do" with the prosecution's case. The prosecutor then discussed other evidence as supporting petitioner's guilt, stressing that none of that evidence had "one iota to do with Joanna." He added that if Joanna "never came here and never said one word, *between the testimony of Darlene and the other witnesses* there is a fabric, there is a thread that goes through the case, and it weaves together with an absolute and compelling certainty," a point the prosecutor twice reiterated in closing argument.

The prosecutor's argument to the jury underscores the materiality of Darlene's false testimony, as the Attorney General essentially conceded at the reference hearing. The Attorney General's brief filed with the referee on August 28, 1995, states: "If this Court finds that Darlene neither witnessed any of the murders nor heard a confession of those murders by petitioner and that her trial testimony in that regard (and, likewise, all the pre-offense incriminating statements Darlene also attributed to petitioner) was false, *then respondent concedes* that since there is no physical evidence linking [petitioner] to any of the three murders, no evidence linking him to Debbie's murder, and only circumstantial evidence linking him to Lynda's murder, *this false evidence* was both material and probative as to guilt and to punishment as to Counts II (Lynda) and III (Debbie). It is also arguable [Darlene's false evidence] is material and probative as to Count I (Denise), *since in his argument [Deputy District Attorney] Tepper told the jury that they*

*[sic] could reject Joanna's testimony in its entirety and still find sufficient evidence to convict on all three counts.*" (Italics added.)

In addition to Darlene's false testimony that petitioner told her he had killed Denise, Debbie, and Lynda, she also lied about seeing Denise get into petitioner's car the night Denise disappeared and finding Debbie's key chain in petitioner's car a day or two after Debbie disappeared.

Darlene's false testimony that on June 12, 1984 (the night Denise disappeared), she saw Denise get into petitioner's car corroborated Joanna's trial testimony that petitioner that night had picked up Denise and then Joanna near the freeway underpass in Placerville. (Compare Joanna's trial testimony on this point (p. 1024, *ante*) with Darlene's (p. 1023, *ante*).) Because Darlene's false testimony tended to support Joanna's testimony by placing Denise in a car with petitioner on the night of her murder, that false testimony by Darlene was particularly damaging to petitioner. Jurors skeptical of Joanna's credibility, which the prosecutor acknowledged was a "major issue" in the case, may have been persuaded of the essential truth of Joanna's testimony because of the corroborating evidence provided by Darlene. Darlene's false testimony about finding Debbie's key chain in petitioner's car shortly after Debbie disappeared, as the deputy attorney general highlighted in the portion of the brief quoted above, was the only evidence presented by the prosecution at trial to tie petitioner to Debbie's murder. Thus, it too was highly damaging.

In determining the materiality of Darlene's *false testimony*—that she saw Denise get into petitioner's car the night Denise disappeared, that she found Debbie's key chain in petitioner's car a day or two after Debbie disappeared, and that petitioner admitted to her that he had killed Denise, Debbie, and Lynda—this court must view it "objectively," in light of all "relevant circumstances" to decide whether there is a "reasonable probability" that the false testimony affected the outcome of the trial. (*In re Sassounian, supra,* 9 Cal.4th at p. 546.) Thus, we must consider the potential effect of Darlene's false testimony on the jury in light of the other evidence favoring the prosecution at trial. Putting aside the testimony of Joanna that defense counsel had effectively impeached, leading the prosecutor to suggest to the jury that Joanna's testimony was unnecessary to the jury's determination of petitioner's guilt, the prosecution's case consisted of this scant circumstantial evidence: Petitioner disliked the Oz-crowd girls, which included murder victims Denise, Debbie, and Lynda, and he had made callous and threatening remarks about them; he was seen with Lynda the night she disappeared, and the next day he had a scratch on his forehead; he told contradictory stories

about whether he knew Lynda; he kept knives, guns, and handcuffs in his car; and he was known to have frequented the forested areas where the girls' bodies were found. Considering the totality of circumstances in this case, I conclude that *Darlene's* false testimony that she saw Denise get into petitioner's car the night Denise disappeared, that she found Debbie's key chain in petitioner's car shortly after Debbie disappeared, and that petitioner told her he killed Denise, Debbie and Lynda was "substantially material or probative" (Pen. Code, § 1473, subd. (b)(1)) on the question of petitioner's guilt.

In concluding that Darlene's false testimony was not material, the majority adopts the referee's finding that defense counsel's cross-examination had " 'torn to pieces' " Darlene's story of petitioner's confession. (Maj. opn., *ante*, at p. 1009.) The referee noted that when defense counsel questioned Darlene about the details of what she claimed petitioner had told her about the killings, she "could not remember the lies she had stated on direct [examination], so [she] either denied them or made [up] new and more obvious lies." From this the majority concludes that the confession's believability was " 'open to question' " and would not have been accepted by the jury. (Maj. opn., *ante*, at pp. 1010-1011.)

I agree that under intense questioning by defense counsel about certain details of the three killings, Darlene's confusion was evident. But in my view her uncertainty did not completely undercut the basic thrust of her testimony—that petitioner, her then boyfriend and near-constant companion, had told her of killing Denise, Lynda, and Debbie. Moreover, as explained on page 1027, *ante*, whether false evidence is material, that is, whether it could have affected the outcome of the trial (see *In re Sassounian, supra*, 9 Cal.4th at p. 546), presents a mixed question of law and fact that this court reviews independently (see *In re Johnson, supra*, 18 Cal.4th at p. 461; *In re Cordero, supra*, 46 Cal.3d at pp. 180-181). Thus, I do not here defer to the referee's findings on the materiality of the false testimony. The false evidence included testimony attributing to petitioner a confession to killing the three teenage victims, which likely would have made a strong impact on the jury. In light of defense counsel's effective impeachment of Joanna (who testified that she saw petitioner kill Denise), the prosecutor's invitation for the jury to find petitioner guilty without considering Joanna's testimony, and the prosecution's otherwise relatively weak circumstantial case against petitioner, there is at least a *"reasonable probability"* that Darlene's false evidence *"could have* affected" the jury's determination of petitioner's guilt. (See *In re Sassounian, supra*, 9 Cal.4th at p. 546.) Accordingly, based on the false testimony of Darlene, petitioner is entitled to habeas corpus relief. (Pen. Code, § 1473, subd. (b)(1).)

## CONCLUSION

For the reasons given above, I would grant the petition for a writ of habeas corpus.